IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § | |
| | § | Case No. 17-31646 |
| MONTCO OFFSHORE, INC., *et al.*,[1] | § | |
| | § | Chapter 11 |
| Debtors. | § | |
| | § | (Joint Administration Requested) |

**DECLARATION OF DEREK C. BOUDREAUX IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Derek C. Boudreaux, hereby declare under penalty of perjury as follows:

**INTRODUCTION**

1.     I am the chief financial officer ("CFO") of Montco Offshore, Inc., a Louisiana

corporation headquartered in Galliano, Louisiana ("MO").  I have worked at MO for over a

decade, first as an intern, then as a full-time employee in MO's accounting department, and,

since January 2010, I have served as its CFO.  I am also a manager of MO's wholly owned

subsidiary, Montco Oilfield Contractors, LLC, a Louisiana limited liability company

headquartered in Houston, Texas ("MOC"), and have served in that role since January 2012.  I

earned a Bachelor's degree in accounting and a Master's degree in business administration from

Nicholls State University.  As a result of my experience at MO and MOC, I am generally

familiar with the companies' day-to-day operations, business and financial affairs, and books

and records.

2.     On the date hereof (the "Petition Date"), MO and MOC (each a "Debtor" and

together the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of

the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the

---

[1]     The Debtors in these chapter 11 cases, together with the last four (4) digits of each Debtor's federal tax identification number, are Montco Offshore, Inc. (1448) and Montco Oilfield Contractors, LLC (9886).  The mailing address for the Debtors, solely for the purposes of notices and communications, is 17751 Hwy 3235, Galliano, Louisiana 70354.

Southern District of Texas (the "Court").  To minimize the possible adverse effects on the Debtors' businesses, the Debtors have filed various motions and pleadings seeking "first day" relief (collectively, the "First Day Pleadings").  I have reviewed the First Day Pleadings.  Based on my knowledge, and after reasonable inquiry, I believe that approval of the relief requested in the First Day Pleadings is necessary to minimize disruption to the Debtors' estates resulting from the filing of these chapter 11 cases.  I also believe that, absent authority to make certain essential prepetition payments and otherwise continue conducting ordinary-course business operations as set forth herein and described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of their creditors and their estates.

3.      All facts and opinions set forth in this declaration are based upon my knowledge of the Debtors' operations, business and employees; information learned from my review of relevant documents; information supplied to me or verified by other members of the Debtors' management and their third-party advisors; and/or my experience, knowledge, and information concerning the oil and gas industry generally.  Unless otherwise indicated, the financial information contained in this declaration is unaudited and subject to change.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts and opinions set forth herein.

4.      This declaration is organized as follows: Part I provides background information on the Debtors and detailed information on their business operations.  Part II describes the Debtors' prepetition organizational and capital structure.  Part III describes the significant distress presently affecting the oil and gas industry, generally, and its impact on the Debtors, specifically, including the events that led to the filing of these chapter 11 cases.  Part IV and

**Exhibit A** summarize the relief requested in, and the factual bases supporting, the First Day Pleadings.

## I.     THE DEBTORS' BUSINESSES

### A.     Montco Offshore, Inc.

5.     Montco Offshore, Inc. was founded by the Orgeron family in 1948, and continues to be owned and managed by the Orgerons.  Historically, MO's focus has been serving the offshore energy industries with crew boats, ocean-going tugs, deck barges, supply boats and liftboats.  Today, MO specializes in the construction and operation of liftboats, providing the highest quality and safety of service for offshore operators requiring versatile elevated vessels and work-platforms in the Gulf of Mexico (the "GoM").  Currently, MO has 99 employees, including management, land-based support, mariners, administration and back-office personnel.

6.     MO's current total fleet of six (6) vessels (collectively, the "MO Vessels") includes (a) two 335' class liftboats, known as (i) "Robert," which was unveiled in the first quarter of 2012, and (ii) "Jill," which was completed in 2014; (b) two 245' class liftboats, known as (i) "Kayd," which was completed in 2006, and (ii) "Myrtle;" which was completed in 2002; and (c) two 235' class liftboats, each completed in 2009, known as (i) "Paul," and (ii) "Caitlin."

7.     Construction of an MO Vessel, start to finish, is approximately a two-year process, which includes the vessel design, submission and approval of construction plans, bidding to vendors for construction-related needs, hiring a shipyard to erect the designs, and completing the project.  Given the current instability of the market and uncertainty with respect to future work streams, MO is not currently constructing any new liftboat vessels.

8.     In addition to the design and construction of new vessels, MO simultaneously solicits and negotiates directly with operators in the GoM who require the use of MO's liftboats

to fulfill the applicable operators' obligations.  Prior to 2015, given the relatively high demand and limited number of vessels in direct competition with the capacities and functionalities of the MO Vessels, MO deployed several liftboats for plugging and abandonment ("P&A") work over the course of long-term, i.e. one year or longer, P&A contracts with GoM operators.

> **B.  Montco Oilfield Contractors, LLC**

9.    In March 2011, MO acquired 80% of Abandonment Consulting Services, LLC ("ACS"), a project management, engineering and oilfield personnel service provider and general contractor.  In January 2012, MO purchased the remaining 20% of ACS and contributed ACS to a new entity, Montco Oilfield Contractors, LLC.  MOC remains wholly owned by MO, its sole member.

10.    MOC is headquartered in Houston, Texas, and has traditionally been staffed with approximately two dozen full-time employees.  MOC also had several independent contractors who served, among other roles, as project managers, coordinators, and engineers.  Over the course of the past few months, however, due to the industry downturn as well as specific difficulties facing MOC, as more fully described below, MOC was forced, beginning in October 2016, to undergo a series of layoffs, ultimately resulting, as of the Petition Date, in a workforce of four (4) full-time, salaried employees.

11.    As a general contractor, MOC utilizes the services of hundreds of vendors and subcontractors (among them, as described above, MO) throughout the GoM for an array of oil and gas offshore projects, including platform construction, installation, modification, repair, flushing, make-safe removal preparation and decommissioning; well intervention, recompletion and abandonments including both sub-sea and hurricane-damaged wells; pipeline flushing and abandonment; site clearance verification; and trawling projects.

12.     MOC also provides, either directly or through its vendors, highly qualified and industry-proven oilfield personnel, including project management professionals, professional engineers, project coordinators, petroleum engineers, mechanical engineers, structural engineers, naval architects, drafters, wellsite managers, clerks, safety representatives, medics, safety and environmental management (SEMS) coordinators, SEMS auditors, logistics coordinators and dock dispatchers.

13.     With safety as its highest priority, MOC provides SEMS compliance assurance on each and every project through its own operator-equivalent SEMS, which is monitored and managed by MOC's SEMS steering committee and SEMS-proficient project managers, ultimate work authorities (UWAs) and clerks.   In 2016, MOC recorded over 1.57 million man hours worked, completing 156 well P&A projects, 50 platform removals, 63 pipeline abandonments, and 39 sites trawled and cleared, while simultaneously managing 4 rigless-well temporary abandonment ("TA") and permanent abandonment ("PA") operations, 4 heavy-lift vessels, 2 make-safe spreads, 2 hydrocarbon-free spreads, 3 site-clearance verification vessels, 22 marine support vessels, and 3 shorebase operations, all with a remarkably low 0.38 recordable incident rate (TRIR).

14.     MOC's relationships with its vendors and subcontractors are generally governed by certain joint master service contracts (the "MSCs") among MOC, MO, and the respective subcontractor(s).   The MSCs include each of MOC and MO solely to maximize certain efficiencies for each entity, given that each may utilize the services of, and are sought after by, the same vendors or subcontractors.

15.     While the MSCs provide a general framework for a working relationship with subcontractors, the day-to-day operations, scope of work, and pricing of projects are governed

by individualized vendor work orders generated by MOC, as necessary.  The balance of the working relationship between subcontractors and the Company continues pursuant to the terms and conditions of the work orders, as well as communications and invoices delivered between the Company and its respective subcontractors.

16.    MOC manages each project from start to finish, including: determining the necessary size of a required vessel(s); crafting schematics and procedures; pre-job spud meetings with all vendors; mobilization and equipment requirements; drafting and submitting regulatory filings; obtaining permits and other governmental approvals; and providing UWAs, offshore oversight representatives, and on-location clerks for purposes of providing daily reporting.  On any given project, MOC may utilize upwards of 50 different subcontractors in order to complete a work scope.  Depending on the scope of work, a project may last anywhere from two weeks to 5 months.  And while the utilization of derrick and material barges is limited by weather conditions and essentially on hiatus during the winter months, MOC's business model is predicated on maximizing efficiencies and work scopes 365 days a year, including year-round use of liftboats and other equipment.

## II.    THE DEBTORS' ORGANIZATIONAL AND CAPITAL STRUCTURE

### A.    The Debtors' Prepetition Organizational Structure

17.    MOC is wholly owned by MO, its sole member.  MO, in turn, is majority owned by Mr. Lee Orgeron, an individual, who serves as its Chief Executive Officer.  Mr. Orgeron is also a manager of MOC.  A chart depicting the Debtors' prepetition organizational structure is attached hereto as **Exhibit B.**

### B.    The Debtors' Prepetition Capital Structure

18.    As of the Petition Date, on a book basis, MOC had an aggregate total of approximately $84 million in total assets, which are mostly made up of receivables, and

approximately $126 million in total liabilities.  As of the Petition Date, on a book basis, MO had an aggregate total of approximately $265 million in total assets, and approximately $136 million in total liabilities.

**1.      The Debtors' Prepetition Secured Debt Obligations**

19.      MO is a borrower and MOC is a subsidiary guarantor under that certain Second Amended and Restated Credit Agreement dated as of January 29, 2016 (as amended, the "Prepetition Credit Agreement") by and among MO and a non-Debtor affiliate, Orgeron Real Estate, L.L.C. ("ORE"), as borrowers, the lender parties thereto (collectively, the "Prepetition Lenders), and JPMorgan Chase Bank, N.A., as administrative agent (the "Prepetition Agent").

20.      The principal amount of the Debtors' consolidated secured debt obligations under the Prepetition Credit Agreement totals approximately $116.6 million, comprising (a) approximately $15 million under the Revolving Loan, (b) approximately $94 million under the Term A-1 Loan, and (c) approximately $7.5 million under the Term C Loan (as each of those terms is defined in the Prepetition Credit Agreement, and collectively, the "Prepetition Secured Debt Obligations").  The Prepetition Secured Debt Obligations are secured by substantially all assets of the Debtors (the "Prepetition Collateral").

21.      The Debtors entered into the Prepetition Credit Agreement in order to consolidate several prior term loans related to the construction of the MO Vessels (specifically, the Robert and the Jill), and to provide additional working capital funds necessary for the continued operations of MO.

22.      As further described below, due to a material decline in the Debtors' access to liquidity over the course of the past year, as of September 2016, MO was in breach of certain covenants under the Prepetition Credit Agreement, and, since last month, has been unable to meet its principal payment obligations.

### 2. The Debtors' Intercompany Obligations

23.     Due to the nature of MOC's general contracting business model, and the need to pay subcontractors and vendors in advance of receiving payment on customer invoices, MO has historically provided working capital funds, on an as-needed basis and in the form of intercompany loans, to MOC, and MOC has reimbursed MO for these advances upon receipt of customer payments.  Similarly, and specifically over the course of the past year while MO's business has been almost entirely dependent on subcontracted work from MOC under the Black Elk Contract (defined and described below), MOC has also provided working capital advances to MO in the form of intercompany loans.  The total amount for these intercompany transactions due and owing from MO to MOC is approximately $15 million.   These transactions are documented as book entries in the Debtors' books and records.

24.     Moreover, as more fully described below, given MOC's liquidity constraints as a result of key issues that arose under the Black Elk Contract, MOC was unable to pay several of its subcontractors and vendors over the course of the past year.   MO was one such subcontractor, and has invoiced but not received payment from MOC for approximately $51 million of subcontracted liftboat work.  Given the $15 million outstanding intercompany loan due and owing from MO to MOC, the net prepetition intercompany balance is approximately $36 million due and owing from MOC to MO (all of the aforementioned, the "Intercompany Obligations").

### 3. The Debtors' Other Obligations

#### a. Other Secured Claims

25.     In the ordinary course of their businesses, the Debtors routinely transact business with a number of third-party contractors and vendors who may be able to assert liens, including

certain maritime liens, against the Debtors and their assets, including the MO Vessels, in the event the Debtors fail to make timely payments for goods delivered or services rendered.

### b.    Trade Claims

26.    As of the Petition Date, the Debtors estimate that approximately $5.3 million was due and owing to holders of prepetition trade claims against MO, and approximately $75 million was due and owing to holders of prepetition trade claims against MOC, not including the Intercompany Obligations described above.

## III.    EVENTS LEADING TO CHAPTER 11

### A.    Market Conditions

27.    With the downturn in the oil and gas industry and the sustained decrease in commodity prices from the beginning of the second half of 2014 through early 2016, companies across the industry faced severe pressures in terms of reduced revenue streams, earnings and cash flows, as well as increasing difficulties to meet certain creditor obligations.  Operators in the industry, who served as customers to each of the Debtors, substantially reduced their existing production and implemented severe cutbacks in capital spending.  These market conditions have impacted oil and gas companies at every level, as many companies in the industry have filed for bankruptcy protection since the beginning of 2015.

28.    Moreover, and as specifically related to the Debtors' businesses, oil and gas companies have substantially deferred maintenance and P&A work in order to conserve cash during the downturn, leading to a decrease in demand for the Debtors' services and, with respect to MOC, the services of MOC's subcontractors and vendors.  The financial impact has vastly deferred or impeded the available work to the Debtors, as operators continued to curtail their P&A obligations.

**B.      Black Elk's Chapter 11 Case**

29.      On August 11, 2015, certain creditors of Black Elk Energy Offshore Operations, LLC ("Black Elk") filed an involuntary chapter 7 petition in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, against Black Elk, whose case, on September 1, 2015, was voluntarily converted from a chapter 7 to a chapter 11 (the "Black Elk Case").

30.      Prior to its bankruptcy filing, Black Elk delivered a confidential bid package to a handful of general contractors, including MOC, seeking bids for decommissioning and P&A work, which Black Elk was required to perform to meet ongoing regulatory obligations at its various properties.  MOC and one other contractor submitted bids, and Black Elk, in its business judgment, determined that MOC's proposal presented the best and most cost-effective plan to meet its P&A obligations.  Black Elk submitted MOC's proposal for Court approval, and, after Black Elk and MOC undertook significant negotiations with all parties in interest, including, among others, the unsecured creditors' committee in the Black Elk Case, Argonaut Insurance Company ("Argo"), and governmental representatives from each of the Bureau of Safety and Environmental Enforcement ("BSEE"), the Bureau of Ocean Energy Management ("BOEM"), and the Department of Justice ("DOJ") on behalf of the Department of the Interior ("DOI"), the Court approved MOC's turnkey agreement on March 1, 2016 (as amended, the "Black Elk Contract").  A true and correct copy of the Black Elk Contract, as approved in the Black Elk Case and as subsequently amended, is attached hereto as **Exhibit C**.

31.      The Black Elk Contract not only provided MOC itself with a significant source of workflow, but also enabled scores of subcontractors, including MO, to continue operating as going concerns, staving off financial distress and/or, in MO's case, the need to significantly reduce its operations, due to rapidly decreasing (or stalled) demand for P&A work.

32.     The aggregate scope of work under the Black Elk Contract included 19 "Jobs" (as that term is defined in the agreement), each including a detailed, particularized scope and service description, as well as the gross price for the Job, and the net price due and owing from Black Elk itself.  There were listed on Exhibit "A" to the Black Elk Contract.  The signatories to the Black Elk Contract included (a) Black Elk, (b) MOC as general contractor, and (c) MO as corporate guarantor of "performance by [MOC] of all of its obligations under and pursuant to [the Black Elk Contract] … and liabilities and responsibilities of [MOC] under and pursuant to [the Black Elk Contract]," as set forth in Section 23 of the Black Elk Contract.  On May 3, 2016, Black Elk submitted a revised Exhibit "A" to the agreement (*see* Docket No. 828 in the Black Elk Case), bringing the total number of Jobs to 20.[2]

33.     Under the Black Elk Contract, MOC was to bill Black Elk for net amounts listed on Exhibit "A", on a Job-by-Job basis, only once respective Jobs were "completed".  The timing of payments is set forth in Section 1.2.3 to the Black Elk Contract, which states:

> All amounts owed to [MOC] shall be paid in connection with the release of any proceeds of surety bonds securing or any cash collateral collateralizing those certain [P&A] obligations and liabilities of [Black Elk] …  in connection with the [P&A] of wells, abandonment … of pipelines and decommissioning oil and gas platforms or caissons (the "P&A Obligations") … all as further delineated on an individualized Job by Job basis on Exhibit "A".

*See* Section 1.2.3.  In other words, as Jobs were completed, proceeds of bonds securing the P&A Obligations for such Jobs were to be released and transferred to MOC at its quoted prices.

---

[2]     Moreover, on May 26, 2016, MOC, Black Elk, W&T Offshore, Inc. and McMoran Oil & Gas LLC filed a joint motion to amend the Black Elk Contract and add additional Jobs for Black Elk's P&A obligations at West Cameron 178, Vermillion 119 and Vermillion 124.  On June 11, 2016, MOC, Black Elk and W&T filed another joint motion to amend the Black Elk Contract and add additional Jobs for Black Elk's P&A obligations at High Island A-370 and Eugene Island 118.  The amendments were approved by the Bankruptcy Court on June 8, 2016 and June 27, 2016, respectively.  Unlike the Black Elk Contract itself, to which only the Debtors and Black Elk are signatories, the amendments include those parties plus the working interest and/or legacy owners as signatories.

34.     MOC acknowledged "that it [would] only be paid from collateral associated with an individual Job identified on Exhibit 'A' once the applicable obligee for any bond or bonds associated with such individual Job fully terminate[d] or cancel[ed] such bond(s) without residual liability as to the specific bonds identified with such line item." *See id.*  That same section, however, includes the following proviso:

> [A]ny remaining bond collateral that exceeds the amounts due and owing for the related Job shall be held and applied toward payment of other Job(s), including those for which the applicable bond amount is less than the turnkey amount for such Job(s).

*Id.*

35.     Thus, parties to the Black Elk Contract expressly manifested an understanding that certain Jobs under the agreement were undercollateralized by appropriate bonding, while others were overcollateralized.  The mechanics of the payment terms, then, were to ensure that as bond collateral was freed up with the completion of overcollateralized Jobs, such additional funding would remain in place and become available as payment to MOC upon the completion of undercollateralized Jobs.[3]

36.     Certain matters that could arise through the duration of the P&A work but could not be anticipated in advance were expressly carved out of the Black Elk Contract as continuing obligations of Black Elk, and not MOC.  Two provisions are illustrative of certain types of such impossible-to-anticipate occurrences that could not be priced into the agreement and were thus carved out:

- **Section 7.9.4**: <u>[Black Elk] Operations to Control a Wild Well, Blowout, or Uncontrolled Flow</u>.  Contractor Group shall not be liable for, and [Black Elk]

---

[3]     By way of example only, Exhibit A to the Black Elk Contract reflects that Job 15 (WC 142) has a turnkey price of $1.35 million, with bonding in the amount of $900,000, whereas Job 9 (MI 687/699) has a turnkey price of $1.86 million, with bonding in excess of $2.4 million.  Thus, while Job 15 is underfunded from a bonding perspective, Job 9 is overfunded, and, according to the Black Elk Contract, those "excess" funds, upon completion of Job 9, would be applied for payment on the underfunded portion of Job 15.

agrees to protect, defend, indemnify, and hold harmless Contractor Group from and against, any and all Property Claims/Losses resulting from the performance of services to control a wild well, blowout, or any other uncontrolled flow, including, without limitation the costs of controlling such a well, <u>even if</u> the Property Claims/Losses are contributed to or caused by the sole, joint, comparative or concurrent negligence, fault or strict liability of any member(s) of Contractor Group or the unseaworthiness of any vessel.

- **Section 7.9.8**: <u>[Black Elk] Responsibility for Hazardous Materials and Hazardous Waste</u>. … [Black Elk] shall, at its sole expense and risk, transport and dispose of (except as otherwise mutually agreed) any spent or used chemicals or their empty packages, drums, or containers or other hazardous waste or materials even if such materials have resulted from or were incident to the performance by any member(s) of Contractor Group of this Agreement … Contractor Group shall not be liable for and [Black Elk] agrees to release, protect, defend, indemnify, and hold harmless Contractor Group from any and all Claims (including, without limitation, cost of control and cleanup), incurred by any member(s) of Contractor Group under any statute, regulation, or otherwise, arising from [Black Elk]'s failure to properly transport and/or dispose of such hazardous waste or materials <u>even if</u> such is contributed to or caused by the sole, joint, comparative, or concurrent negligence of any member(s) of Contractor Group or the unseaworthiness of any vessel.

37.    Because MOC could not have known of certain hazardous materials or waste present at the various properties at which it would be performing the P&A work, it did not price each Job with assumptions related to removal of those materials or waste. Similarly, because uncontrolled flows, blowouts, and wild wells are impossible to predict in advance for purposes of pricing a P&A contract, these matters were also excluded from MOC's cost liabilities under the Black Elk Contract.

38.    To be sure, in order to fully service each property appropriately and achieve site clearance, MOC would indeed be required to perform these aforementioned obligations, i.e. attending to wild wells, blowouts, uncontrolled flows, and/or the removal of hazardous materials and waste. To not do so, and to return to Black Elk or working-interest and/or legacy owners seeking their performance of such obligations or otherwise seeking to renegotiate payment terms, would lead to extreme delays on MOC's plans to complete the various scopes of

work.   Indeed, in certain instances, delaying and/or leaving a site could pose additional environmental risks and trigger significant regulatory issues for Black Elk and other parties in interest.   Hence these provisions were built into the "Indemnification; Special Situations" section of the Black Elk Contract, and Black Elk agreed to bear the costs of these extra projects.

39.     What is more, MOC's performance of these "special" or "extra" P&A obligations would ultimately save Black Elk (and the working interest and/or legacy owners) an enormous amount of time and money, given, absent MOC's performance, Black Elk would be required to retain additional contractors for the additional, unanticipated scope of work in order to obtain proper permitting and/or achieve site clearance.

40.     Thus, the Black Elk Contract, as approved by all parties in interest, provided the most efficient mechanism to ensure that the P&A plan would be executed in an expeditious, effective manner, while maintaining the integrity of the turnkey pricing structure and not creating additional, unsustainable risks for the contractor.   During the scope of work, all parties were informed, through daily job reports, of all work performed by MOC.

**C.     MOC's Performance Under the Black Elk Contract**

41.     Immediately upon Court approval of the Black Elk Contract, MOC commenced the P&A work, in an effort to complete the work in a safe and efficient manner during favorable-weather months in the GoM.   Over the course of 2015 and 2016, MOC, through its subcontractors and vendors, including MO, was able to complete a substantial amount of the obligations pursuant to the Black Elk Contract, removing 33 platforms, completing 129 well P&A projects, and abandoning 41 pipelines.   Indeed, in 2016 alone, of the over $100 million in milestones under the Black Elk Contract, MOC achieved close to $75 million.

42.     In an effort to manage and complete the P&A work diligently and quickly, MOC simultaneously enlisted multiple P&A equipment spreads, including utilization of the MO

Vessels, to cover a wide-ranging number of Jobs across the GoM.  These campaigns included the following processes: make-safe operations for preparing personnel platforms; follow up for well intervention and well P&A spreads, in order to abandon all wells; follow up with additional spread of equipment to clean vessels and prepare platforms for decommissioning; utilize multiple spreads of equipment to deconstruct platforms and pull objects from the water; employ vessels to trawl at each site; and file end-of-operations reports and submit them to the government for site clearance.

43.    Given the aforementioned payment triggers, the Black Elk Contract exposed MOC to over $20 million of vendor liabilities just at the outset of MOC's performance.  To be sure, vendors were asked to extend payment terms and credit in order to allow for MOC to complete its obligations under the agreement and trigger payment releases to MOC, such that MOC could then pay vendor invoices.  Moreover, at the outset of performance under the Black Elk Contract, MO was able to assist MOC in the form of as-needed working-capital intercompany loans, as further described above.

44.    However, a combination of in-the-field, impossible-to-anticipate complications, slow turnaround times with respect to governmental approvals (both on the front end related to permitting and on the back end related to site clearance), and delayed collateral releases plagued MOC with severe cash flow problems, and also immensely increased the costs associated with performance under the Black Elk Contract.  These unforeseen – and, with respect to MOC, unavoidable – circumstances, undermined MOC's ability to timely and fully pay its subcontractors for the work performed for Black Elk and its affiliates, and resulted in severe cost overruns that could not have been anticipated.

45.     Again, as described above, MO, as MOC's liftboat services provider with respect to the Black Elk P&A work, was (and is) the largest unpaid subcontractor to date, accruing approximately $51 million in unpaid invoices for work performed.

    **D.**    **Unforeseen Complications Under the Black Elk Contract**

46.     Three primary categories of complications became apparent to MOC over the course of its performance of the P&A work.  First, certain unanticipated matters that arose throughout the P&A performance are expressly covered by the Black Elk Contract and carved out as liabilities of Black Elk (the "Contractual Obligations").  These matters include MOC's performance of work related to "uncontrolled well flows," as well as cleaning and disposing of hazardous materials and waste, and naturally occurring radioactive materials ("NORM").  Again, although the contract places the burden of these Contractual Obligations on Black Elk, nonetheless MOC expended millions of dollars of costs on the front end to address these matters in real time and create significant cost savings for Black Elk and other interest parties.  MOC estimates that the total amount expended on the Contractual Obligations was approximately $7.9 million.

47.     Second, with respect to several properties, MOC, either once mobilized at a location or as it was performing the P&A work, discovered additional wells, structures, flare piles, or other items that required attention in order to obtain permitting and/or other approvals (including site clearance) from BSEE and BOEM, which were not ever disclosed to MOC (the "Out-of-Scope, Unidentified Work").  Not only were these additional, unknown matters not disclosed by Black Elk in its bid package or during contract negotiations, but they were also not referenced on the relevant governmental databases that track wells and structures, and thus were impossible to identify – and therefore impossible to price into the Black Elk Contract – prior to

MOC's on-site mobilization.  MOC estimates that the total amount expended on the Out-of-Scope, Unidentified Work was approximately $4.5 million.

48.    Third, with respect to several properties, while, unlike in the prior description, MOC was aware of the *existence* of certain wells and structures, it was not aware of the true scope of work required to P&A such wells and structures until it was on-site.  Thus, while the Black Elk Contract included a detailed scope of work for each property's structures and wells, the actual required scope of work often differed from that which was negotiated, due to certain misrepresentations recorded in Black Elk's books and records which were relied upon in the negotiation process by all parties (the "Misrepresented Scope of Work").    These misrepresentations included in Black Elk's books and records related to, among other things, the TA/PA status of certain wells, the condition of certain platforms, and other related issues.  MOC estimates that the total amount expended on the Misrepresented Scope of Work was approximately $12.25 million.

49.    In total, the aggregate amount of additional, unanticipated work that was completed by MOC but was ultimately the liability of Black Elk and its working interest partners and/or legacy owners, totals approximately $25 million.[4]

50.    For each of the categories described above, had MOC not completed the additional work, it would not have been able to complete the P&A work at any of the applicable locations, as it could not have obtained appropriate governmental liability reduction for each Job.  What is more, Black Elk and the legacy and/or working interest owners would have still

---

[4]    This number does not account for the substantial indirect costs incurred by MOC related to the aforementioned out-of-scope issues, which caused significant delays for the balance of work to be performed under the Black Elk Contract.  Moreover, MOC also incurred several millions of dollars in additional costs related to various incident-of-noncompliance (INC) remediations, excessive debris removals, and BOEM-required archaeological surveys, all of which are outside the scope of the Black Elk Contract and the obligations of Black Elk, not its P&A contractor.

remained liable for the additional remediation costs (not to mention the underlying P&A work), and those costs would certainly have increased had MOC demobilized and remobilized each time it encountered an unanticipated complication, or had MOC stopped work to renegotiate contractual terms, given that the field-level labor and equipment costs on each spread could range anywhere from $2,000 per hour to $6,500 per hour.

51.     Moreover, it is important to re-emphasize that the additional work performed by MOC is not news to anyone who has been paying attention.  Each day, MOC circulated daily reports regarding its progress on the P&A plan to Black Elk, the working interest owners, and the legacy owners.  Every matter that was "extra," and thus not priced into the contract, was disclosed to these parties in interest through these daily reports.  Despite that, while, in the aggregate, MOC expended nearly $25 million related to the extra, unanticipated work, MOC has not received payment for <u>any</u> of this additional work from any of the parties.  The impact of those additional costs and expenses has not only been borne by MOC, but also by its subcontractors and vendors who performed the Black Elk P&A obligations, including MO.

**E.     Issues Related to Payment Streams**

52.     In addition to field-level issues related to the scope of work under the Black Elk Contract, MOC also faced issues related to the payment mechanisms under the agreement, resulting in delayed releases of bond collateral and payments, which contributed to increasing amounts of pressure from MOC's subcontractors.

53.     Specifically, even though MOC removed a large amount of the financial liability under the agreement, it consistently encountered the following payment issues, among others: BSEE and BOEM were, at times, unable or unwilling to update their respective websites in a reasonably timely fashion showing that decommissioning liabilities had been reduced to $0; bond obligees would not authorize the relevant sureties to release bonds on a Job-by-Job basis,

given those obligees were covered by bonds that encompassed more than one Job, as defined by the contract; and, despite the clear language in the contract, sureties would not release collateral from the overcollateralized, completed Jobs in order to fund the undercollateralized projects. Again, all of this, coupled with the high costs for out-of-scope work described above, resulted in increasingly delayed payment turnarounds from MOC to its vendors and subcontractors, including MO.

### F.    Debtors' Attempts to Restructure Payment Terms and Obligations

54.    By October 2016, as a result of all the aforementioned issues created by the additional work and costs, as well as by the payment delays, it became clear to MOC that it could not continue to meet its obligations to vendors under the payment structure and workflow obligations of the Black Elk Contract.   These obligations included the approximately $51 million that has since accrued and remains due and owing to MO.  As such, MOC expended a great deal of time and effort negotiating with all stakeholders, including Argo, legacy owners, bondholders, as well as BSEE and BOEM, to craft alternative payment arrangements, including bond riders and reductions, and even advance payments, so that both BOEM and Argo would release bond collateral on a partial basis, as decommissioning liabilities were reduced, instead of waiting for a Job to reach its completion.

55.    While these solutions provided temporary cash flow relief and allowed MOC to begin catching up on vendor liabilities, ultimately even the partial payment arrangement was plagued by delays, unanticipated requirements and requests, and, at bottom, only served as a temporary fix that could not adequately address the elephant in the room, namely the $25 million of extra, out-of-scope work.

56.    It should also be noted that each of the Debtors had limited options in terms of alternative sources of cash.  Given the state of the industry and the relatively small and low-

priced amounts of available work, lenders were wary to provide any sort of credit or financing to service providers like MOC, given its relatively few hard assets, or to subcontractors like MO, given its significant secured liabilities and a potentially uncertain market for its collateral.

57.     In the operation of its liftboats, MO utilizes the services of certain critical vendors, including shipyards, grocery and fuel suppliers, crane services providers, pump suppliers, technicians, and other mission-critical vendors to sustain day-to-day operations. Unless those critical vendors and subcontractors are paid certain prepetition amounts and/or assured of future, regular payment streams, the Debtors will have substantial difficulties in inducing them to continue on any of the Black Elk or other of the Debtors' projects once weather conditions improve and allow for the resumption of work.

### G.     Chapter 11 Filing

58.     Leading up to the filing of these chapter 11 cases, each of the Debtors attempted to negotiate out-of-court paths forward with its key stakeholders.  MOC, with the assistance of its advisors, attempted to develop a plan that would provide partial payments to subcontractors and vendors, and craft a payment mechanism by which MOC could provide assurances of future payments in consideration for the subcontractors' continued work on outstanding projects, both under the Black Elk Contract and otherwise.  As a general contractor, MOC's primary concern has always been to create and sustain positive, reliable and transparent relationships with its subcontractors.  MOC therefore did all that it could to stay out of bankruptcy and meet its obligations due and owing to creditors.

59.     Ultimately, however, it became clear that negotiating terms and conditions with over 300 subcontractors and vendors in a constrained time period, as well as with other parties in interest, including the sureties, working interest and legacy owners, and the relevant governmental entities, could only be most efficiently accomplished in a consolidated,

centralized process.  This is especially so given that certain vendors have begun initiating litigation proceedings, which only increases the number of directions in which MOC is being pulled.

60.    Similarly for MO, while it attempted to negotiate a path forward with its Prepetition Lenders and other key stakeholders outside of a chapter 11 process, given its strained cash positions and outstanding, large unpaid receivables from MOC, coupled with increased pressure from potential lienholders and the initiation of certain disputed seizure actions against the MO Vessels, it became increasingly clear that a transparent restructuring process in chapter 11 would be in the best interests of all of MO's stakeholders, too.

61.    In short, the Debtors believe that the filing of these chapter 11 cases will provide the necessary breathing room for each entity to craft value-maximizing plans and obtain the highest and best recovery possible, under the circumstances, for all creditors, in a fair and open manner.

## IV.    FIRST DAY PLEADINGS

62.    Contemporaneously herewith, the Debtors have filed various First Day Pleadings seeking orders granting relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The Debtors intend to seek entry of Court orders approving each of the First Day Pleadings as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Southern District of Texas.  Absent the Court granting the relief requested by the Debtors in their First Day Pleadings on an emergency basis, I believe that the Debtors will suffer immediate and irreparable harm.

63.     A description of the relief requested and the facts and opinions supporting each of the First Day Motions is detailed in **<u>Exhibit A</u>**, attached hereto.

[*Remainder of Page Intentionally Left Blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2017
   Houston, Texas

          Derek C. Boudreaux

          Chief Financial Officer
          Montco Offshore, Inc.

          Manager
          Montco Oilfield Contractors, LLC