### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 17-31646** |
| **MONTCO OFFSHORE, INC., *et al.*,**[1] | § | |
| | § | **Chapter 11** |
| **Debtors.** | § | |
| | § | **(Jointly Administered)** |

**EMERGENCY MOTION OF DEBTOR MONTCO OFFSHORE, INC.
FOR AN ORDER (I) APPROVING (A) BIDDING PROCEDURES GOVERNING
SUBMISSION AND CONSIDERATION OF COMPETING TRANSACTIONS, (B) BID
PROTECTIONS, (C) FORM AND MANNER OF NOTICE OF SALE TRANSACTION
AND SALE HEARING, AND (D) ASSUMPTION AND ASSIGNMENT PROCEDURES
FOR ANY TRANSFERRED CONTRACTS; (II) (A) SCHEDULING AND
AUTHORIZING DEBTOR TO CONDUCT AN AUCTION PURSUANT TO THE
BIDDING PROCEDURES, AND (B) AUTHORIZING DEBTOR TO ENTER INTO THE
PURCHASE AGREEMENT TO IMPLEMENT THE BIDDING PROTECTIONS;
(III) AUTHORIZING (A) THE SALE OF THE PURCHASED ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIM, ENCUMBRANCES, AND OTHER INTERESTS,
AND (B) THE ASSUMPTION AND ASSIGNMENT OF ANY TRANSFERRED
CONTRACTS; AND (IV) GRANTING RELATED RELIEF**

> **THE DEBTOR REQUESTS THAT A HEARING ON THIS MOTION BE
> HELD ON DECEMBER 4, 2017 AT 3:00 P.M. (PREVAILING CENTRAL
> TIME), IN COURTROOM 404, 4TH FLOOR, UNITED STATES
> BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS,
> 515 RUSK AVENUE, HOUSTON, TEXAS 77002.  IF YOU OBJECT TO
> THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING,
> SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS
> PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU
> MUST FILE YOUR RESPONSE WITH THE CLERK OF THE
> BANKRUPTCY COURT WITHIN TWENTY-ONE DAYS FROM THE
> DATE YOU WERE SERVED WITH THIS PLEADING.  YOU MUST
> SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT
> YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE
> PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

[1] The Debtors in these chapter 11 cases, together with the last four (4) digits of each Debtor's federal tax identification number, are Montco Offshore, Inc. (1448) and Montco Oilfield Contractors, LLC (9886).  The mailing address for the Debtors, solely for the purposes of notices and communications, is 17751 Hwy 3235, Galliano, Louisiana 70354.

> **EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, YOU WILL HAVE FEWER THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE A RESPONSE NO LATER THAN 4:00 P.M. (PREVAILING CENTRAL TIME) ON FRIDAY, DECEMBER 1, 2017.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.**

**TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:**

Debtor Montco Offshore, Inc. ("MOI" or the "Debtor"), a debtor and debtor-in-possession in the above-captioned chapter 11 cases of MOI and its wholly owned subsidiary, Montco Oilfield Contractors, LLC ("MOC" and, together with MOI, the "Debtors"), by and through its counsel, Drinker Biddle & Reath LLP and DLA Piper LLP (US), hereby moves the Court (the "Motion") for entry of an order substantially in the form attached hereto as Exhibit A (the "Bid Procedures Order"): (I) approving (A) bidding procedures governing the submission and consideration of competing bids (individually, a "Competing Transaction" and, collectively, the "Competing Transactions") for substantially all of MOI's assets (the "Purchased Assets") in the form attached as Exhibit 1 to the Bid Procedures Order (the "Bidding Procedures"), (B) certain Bidding Protections (as defined herein) for Falcon Global USA LLC ("Falcon USA" or the "Stalking Horse"), (C) the form and manner of notice of an auction for Competing Transactions (the "Auction"), the acquisition of the Purchased Assets by the Stalking Horse in accordance with terms to be agreed to and memorialized in the Purchase Agreement and the Claims Assignment Agreement (each as defined herein and, such sale, the "Proposed Transaction"), and a hearing to approve the Proposed Transaction or a Competing Transaction, as applicable (the "Sale Hearing"), and (D) the procedures for assuming and assigning certain

executory contracts or unexpired leases in connection with the Proposed Transaction or a Competing Transaction, as applicable; (II) (A) authorizing and scheduling the date for an Auction, if any, and Sale Hearing, and (B) authorizing the Debtor to enter into that certain Asset Purchase Agreement, which will be entered into and filed promptly after the date of this Motion, by and between MOI and the Stalking Horse for the purchase by the Stalking Horse of the Purchased Assets (the "Purchase Agreement"), to the extent necessary to implement the Bidding Protections; (III) authorizing (A) the sale of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code and (B) the assumption and assignment of certain executory contracts or unexpired leases in connection with the Proposed Transaction or a Competing Transaction, as applicable; and (IV) granting related relief.

At the Sale Hearing, MOI will request entry of an order (the "Sale Order"), pursuant to sections 105(a) and 363(b), (f), and (m) and 365 of the title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving the transactions contemplated by the Purchase Agreement or the transactions contemplated by any agreement or agreements reached with the party or parties submitting the highest or otherwise best bid for the Purchased Assets.  In support of this Motion, MOI respectfully states as follows:

## **JURISDICTION**

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this case is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The bases for the relief requested herein are sections 105(a), 363(b), 503 and 507 of the Bankruptcy Code, Rules 2002 and 6004, 6006, 9007 and 9014 of the Bankruptcy Rules, Rule 5 of the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases (the "Southern District Complex Procedures"), and Rule 2002-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas (together with the Southern District Complex Procedures, the "Local Rules").

3.      MOI consents to the entry of a final order or judgment by the Court in connection with this Motion to the extent that it is later determined that the Court cannot enter such final order or judgment consistent with Article III of the United States Constitution absent consent of the parties.

## PRELIMINARY STATEMENT

4.      MOI has faced challenging financial and operational conditions since long before the Petition Date (defined below).   Over the past year, the Debtor and its advisors have thoroughly explored multiple strategic and restructuring alternatives, including the sale of all or some portion of the Debtor's assets.   In particular, since approximately February 2017, the Debtor has conducted two distinct sales processes run by two highly-skilled investment banks that contacted more than 400 potential buyers.   Following those processes, and after extensive deliberations with its advisors, MOI concluded that the best value-maximizing path was the Prior Proposed Transaction (defined below), including the joint venture structure contemplated therein.   Thus, following the conclusion of the Court-supervised sale process (the second formal sale process for the same assets), MOI sought Court approval of the Prior Proposed Transaction through confirmation of a plan of reorganization.   At the same time, in an effort to ensure a

consensual restructuring of both estates, MOI and MOC, with support from the Stalking Horse's parent entity, engaged in extensive discussions with counsel to the Committee (defined below) to negotiate and memorialize a settlement regarding the treatment of MOI's and MOC's creditors. The resulting Plan comprised chapter 11 plans of reorganization and liquidation for MOI and MOC, respectively, which proposed to provide unsecured creditors with a significant opportunity for recovery.

5.      In connection with its efforts to confirm the Plan, MOI filed a motion seeking to estimate certain asserted maritime lien claims at $0.00 for voting purposes, which the Court denied. Instead, the Court estimated the asserted maritime lien claims for voting purposes as secured claims in the amounts in which they were filed. Given the amount at stake (approximately $12 million), the decision on the estimation motion – although not dispositive with respect to the merits of such claims – gave rise to a critical inflection point in these Cases and put in jeopardy the Debtors' ability to confirm and implement the Plan in a timely and consensual manner.

6.      Following the Court's decision, MOI had two options: (i) delay emergence for an unknown time and engage in what may be protracted and expensive litigation on the merits of the asserted maritime claims or (ii) pursue a different path to maximize value to stakeholders. To be sure, MOI expects that it would ultimately prevail in demonstrating that the asserted maritime lien claims are unsecured because, *inter alia*, (i) the value of the relevant vessels is not greater than the value of MOI's prepetition secured obligations (which are in all respects senior to the asserted maritime lien claims) and (ii) the related services are not "necessaries" within the meaning of the Commercial Instruments and Maritime Lien Act, 46 U.S.C. §31342. There is, nonetheless, a risk of loss associated with the litigation.

7.      Given MOI's extremely challenged liquidity profile, MOI's estate simply cannot bear this risk.  Stated differently, if MOI elects to proceed with litigating the nature and extent of the asserted maritime lien claims and ultimately loses on the merits, MOI would have no choice but to pursue a fire-sale liquidation, which would be the worst outcome for all stakeholders.  As such, MOI has concluded that it is no longer feasible to proceed with the Plan, including the contribution of assets to the special purpose joint venture contemplated thereunder.

8.      Leading up to and following the Court's decision on estimating the maritime liens, MOI continued discussions with its advisors and key constituencies, including certain holders of the Asserted Maritime Lien Claims (defined below), regarding MOI's options for a path forward.  As a result of those discussions, and after taking into account the Debtors' rapidly deteriorating liquidity profile, MOI concluded that it has no viable alternative other than to sell all or substantially all of MOI's assets free and clear of liabilities pursuant to section 363 of the Bankruptcy Code.  Accordingly, during recent weeks, MOI and its advisors engaged in discussions and preliminary negotiations with the Stalking Horse and JPMorgan Chase Bank, N.A., as administrative agent under MOI's prepetition first lien facility (the "First Lien Facility") and debtor-in-possession financing facility (the "DIP Facility") respectively (in such capacities, the "First Lien Agent"), regarding the terms for a stalking horse bid (the "Stalking Horse Bid") for substantially all of MOI's assets.  The result of the Debtor's efforts is that the Stalking Horse is willing to enter into the Proposed Transaction.

9.      The Proposed Transaction contemplates that the Stalking Horse will purchase substantially all of MOI's assets (on terms and conditions that will be agreed to and memorialized in the Purchase Agreement) in exchange for (x) $131,099,286.35 (the "Credit Bid Amount"), representing the expected outstanding obligations and indebtedness of MOI under the

DIP Facility and the First Lien Facility upon closing (collectively, the "Secured Obligations"),[2] to be satisfied in the form of a credit bid pursuant to section 363(k) of the Bankruptcy Code (the "Credit Bid"), and (y) the release of the liabilities arising under the DIP Facility and First Lien Facility equal to the amount of the Credit Bid, as will be memorialized in, and fully described by, the terms and conditions of the Purchase Agreement.  As part of the Proposed Transaction, the Stalking Horse, the First Lien Agent and the lenders under the DIP Facility and the First Lien Facility (collectively, the "Lenders" and, each, a "Lender") expect to finalize an agreement, under which the Stalking Horse will purchase and assume the Secured Obligations held by the First Lien Agent and Lenders in exchange for the Stalking Horse entering into, as borrower, a new credit facility immediately upon closing.[3]

10.    The Proposed Transaction would provide for the going concern sale of MOI's assets and, importantly, the Stalking Horse Bid remains subject to higher or better offers in accordance with the Bidding Procedures.  Under the Proposed Transaction, existing holders of equity would not be entitled to an interest in the Purchased Assets, which would be sold directly to the Stalking Horse free and clear of all liens, claims, and encumbrances.

11.    Although the transactions contemplated under the Plan previously reflected the Debtor's preferred path forward, the Debtor's current financial position compels the immediate sale of the Debtor's assets as the only viable means to maximize the value of MOI.  Indeed, it is MOI's judgment that if it cannot achieve a free and clear sale in accordance with the Bidding Procedures, all of the value that has been created and preserved through the chapter 11 case

---

[2]    As of the date hereof, the Secured Obligations are $127,101,705.58.  However, MOI will need to draw upon the full balance of the DIP Facility prior to the anticipated closing date of the Proposed Transaction, which draw down is reflected in the Credit Bid Amount.

[3]    The parties are memorializing this agreement in advance of a hearing on the Motion and will disclose the terms of the agreement with the Court.  Neither the First Lien Agent nor the Lenders have fully approved the terms of the Purchase Agreement and the Claims Assignment Agreement as they are still being finalized.  Accordingly, the Purchase Agreement and the Claims Assignment Agreement remain subject to the continued review, comment and final approval of the First Lien Agent and the Lenders.

could be destroyed and MOI will be left with no choice but to liquidate its business through a fire-sale liquidation process. *See Declaration of Michael Boone in Support of Emergency Motion of Debtor Montco Offshore, Inc. for an Order (I) Approving (A) Bidding Procedures Governing Submission and Consideration of Competing Transactions, (B) Bid Protections, (C) Form and Manner of Notice of Sale Transaction and Sale Hearing, and (D) Assumption and Assignment Procedures for Any Transferred Contracts; (II) (A) Scheduling and Authorizing Debtor to Conduct an Auction Pursuant to the Bidding Procedures and Scheduling Sale Hearing, and (B) Authorizing Debtor to Enter Into the Purchase Agreement to Implement Bidding Protections; (III) Authorizing (A) the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (B) the Assumption and Assignment of Any Transferred Contracts; and (IV) Granting Related Relief* (the "Boone Decl."), attached hereto as Exhibit B, ¶15.

12.     Further, the Debtor submits that, in light of the Debtor's prior two sales processes, a longer process would not be beneficial or practical. *Id.* ¶17.  Moreover, the Debtor cannot afford an extended sales process. *Id.* ¶16.  Plainly stated, although the DIP Facility provides the liquidity needed to carry out a third marketing and sale strategy, the MOI estate does not have access to liquidity for a protracted sale process.  MOI believes that it has sufficient liquidity to operate through the end of January 2018. *Id.* ¶12.  Even that projection is optimistic, however, given that expected cash receipts over the next two months are concentrated among a few customers, which could cause collection delays and, in turn, would have a severe impact on liquidity. *Id*.

13.     As such, the proposed sale process, conducted in accordance with the expedited timeline set forth in the Bidding Procedures, is the best and *only* viable path forward.  Although

MOI expects to simultaneously prepare and prosecute a liquidating plan for each of MOI and MOC (the latter having already been substantially incorporated into the prior Plan), the only relief sought herein is approval of the Bidding Procedures, which are substantially similar to the procedures already approved by this Court and have only been improved to encourage parties to submit bids.  Importantly, despite the added time, expense, and risk associated with the Proposed Transaction, through this Motion the Debtor is not seeking to expand the Stalking Horse's Bid Protections; the Debtor is only seeking entry of an order confirming that the Stalking Horse is entitled to substantially the same Bid Protections with respect to the Proposed Transaction that the Court approved in connection with the Prior Proposed Transaction.

14.     For these reasons, the Motion (including the Bidding Procedures and Bid Protections) should be approved.  There will be a noticed sale hearing at which parties can object to any proposed sale, the Stalking Horse, and/or the winning bidder.

## GENERAL BACKGROUND

15.     MOC, a Louisiana limited liability company headquartered in Houston, Texas, is wholly owned by MOI, its sole member.  MOI, a Louisiana corporation, is majority owned by Mr. Lee Orgeron, an individual, who serves as its Chief Executive Officer.  Mr. Orgeron is also a manager of MOC.

16.     MOI's current total fleet of six (6) vessels (collectively, the "MOI Vessels") includes (a) two 335' class liftboats, known as (i) "Robert," which was completed in 2012, and (ii) "Jill," which was completed in 2014; (b) two 245' class liftboats, known as (i) "Kayd," which was completed in 2006, and (ii) "Myrtle;" which was completed in 2002; and (c) two 235' class liftboats, each completed in 2009, known as (i) "Paul," and (ii) "Caitlin."

17.     On March 17, 2017, MOI and MOC each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition Date").  The bankruptcy cases of MOI and MOC are jointly administered under Case No. 17-31646 (together, the "Bankruptcy Cases"), and are currently pending before the Honorable Marvin Isgur in the United States District Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").  Each Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

18.     On March 29, 2017, the United States Trustee for Region 7, including the Southern District of Texas (the "US Trustee") appointed a committee of unsecured creditors (the "Committee") in the Bankruptcy Cases [ECF No. 82].  On May 30, 2017, the US Trustee filed a *Notice of Appointment of Reconstituted Committee of Unsecured Creditors*, reconstituting the Committee [ECF No. 269].

19.     Reference is made to the *Declaration of Derek C. Boudreaux in Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 3] and the Disclosure Statement (defined below) for additional information regarding the Debtors and the Bankruptcy Cases, including the Debtors' business operations, capital structure, financial condition, the reasons for and objectives of the Bankruptcy Cases, and significant events in the Bankruptcy Cases.

20.     On June 23, 2017, MOI filed the *Motion of Debtor Montco Offshore, Inc. for an Order (I) Approving Term Sheet with SEACOR LB Holdings LLC in Connection With Proposed Transaction to Act as Sponsor of Montco Offshore, Inc.'s Plan of Reorganization; (II) Approving Bidding Procedures Governing Submission and Consideration of Competing Plan Sponsorship Proposals; (III) Approving Break-Up Fee; (IV) Scheduling and Authorizing Montco Offshore, Inc. to Conduct an Auction Pursuant to Such Procedures; (V) Approving the Form and Manner*

*of Notice Thereof and (VI) Granting Related Relief* (the "Prior Bidding Procedures Motion")
[ECF No. 302] seeking approval of a plan term sheet (the "Prior Stalking Horse Bid") with
SEACOR LB Holdings LLC ("SLH") as the stalking horse and proposed sponsor for the plan of
reorganization of MOI (the "Prior Proposed Transaction"), which was subject to higher and
better bids, and approving bidding and auction procedures for other parties in interest to submit
competing bids.  A hearing was held on the motion on August 3, 2017 (the "Hearing").  Certain
modifications to the proposed order were made on the record of the Hearing, and the Bankruptcy
Court orally approved the Prior Bidding Procedures Motion on the record of the Hearing, subject
to those modifications.  On August 7, 2017, MOI filed a revised proposed order, inclusive of the
modifications agreed to on the record of the Hearing [ECF No. 390].  The Bankruptcy Court
formally entered an order on August 10, 2017 (the "Prior Bidding Procedures Order") [ECF No.
394].

21.     The Prior Bidding Procedures Order set forth specific requirements for potential
bidders to submit competitive bids against the Prior Stalking Horse Bid, with an auction to be
held, if necessary.  No competing bids were received prior to the relevant bid deadline.  On
August 28, 2017, MOI filed a *Notice of Cancellation of Auction and Selection of Winning Bidder
With Respect to Proposed Transaction to Act as Plan Sponsor for Debtor Montco Offshore,
Inc.'s Plan of Reorganization* [ECF No. 413] and declared SLH the winning bidder under the
terms of the Prior Bidding Procedures Order.

22.     On September 26, 2017, the Debtors filed chapter 11 plans of reorganization and
liquidation for Montco Offshore, Inc. and Montco Oilfield Contractors, LLC, respectively [ECF
No. 439] (together, and as amended, the "Plan") and a disclosure statement in connection
therewith [ECF No. 440] (as amended, the "Disclosure Statement").  The Plan contemplated the

creation of a special purpose joint venture, Falcon Global Holdings LLC ("Falcon JV"), and a wholly owned subsidiary of Falcon JV, Falcon USA, to own, hold, and operate the assets of MOI contributed thereto and additional assets contributed thereto by SLH, in each case, pursuant to the terms and conditions of the Prior Proposed Transaction. The Plan further contemplated that Falcon JV would receive contributions from each of MOI and SLH, a subset of which would then be contributed to Falcon USA, with approximately 70% of the equity ownership in Falcon JV held by SLH and approximately 30% of the equity ownership in Falcon JV held by MOI from and after the effective date of the Plan.

23.     On October 6, 2017, the Court entered the Scheduling Order conditionally approving the Debtors' Disclosure Statement, and permitting the Debtors to commence solicitation of the Plan. The Scheduling Order also scheduled a hearing to consider confirmation of the Plan and final approval of the Disclosure Statement (the "Confirmation Hearing") for November 13, 2017, at 9:30 a.m. (prevailing Central Time), established October 31, 2017, at 4:00 p.m. (prevailing Central Time) as the voting deadline for the Plan (the "Voting Deadline"),[4] and established November 7, 2017, at 4:00 p.m. (prevailing Central Time) as the objection deadline for the Plan and Disclosure Statement (the "Objection Deadline"), and approved certain solicitation and tabulation procedures.

24.     On October 16, 2017, the Debtors filed their *Motion for Entry of an Order Estimating Secured Claims of C&G Welding, Inc., Alliance Energy Services, LLC, Oceaneering International, Inc., and Aqueos Corporation for Purposes of Allowing Plan Confirmation to Proceed* [ECF No. 494] (the "Estimation Motion") seeking to estimate and temporarily allow in an amount equal to zero dollars ($0) the alleged secured claims (the "Asserted Maritime Lien

---

[4]     Pursuant to a Stipulation by and among the Debtors, the Committee and the US Trustee, as so-ordered by the Court on November 8, 2017 [Docket No. 575], the Voting Deadline was extended to November 7, 2017 at 4:00 p.m. (prevailing Central Time).

Claims") asserted by each of C&G Welding, Inc., Alliance Energy Services, LLC, Oceaneering International, Inc., and Aqueos Corporation.

25.     At a hearing held on November 6, 2017, the Court found that the Debtors failed to carry their burden of proof in connection with the valuation of the MOI Vessels (defined below) at less than the prepetition secured debt obligations.   Furthermore, in a bench ruling on November 8, 2017 (the "November 8 Ruling"), the Court denied the Debtors' Estimation Motion and ordered the Asserted Maritime Lien Claims be estimated for voting purposes as secured claims in the amounts in which they were filed.[5]

26.     On November 9, 2017, the Debtors filed their *Emergency Motion for Entry of an Order Continuing the Confirmation Hearing* [ECF No. 585] requesting a continuation of the Confirmation Hearing while the Debtors engaged in discussions with SLH, in its capacity as plan sponsor, their prepetition secured lenders, and the Committee to determine what changes, if any, needed to be made to the Plan or otherwise, in order to effectively emerge from chapter 11.  On the same day, the Court entered an order continuing the Confirmation Hearing to November 20, 2017 [ECF No. 586].

27.     On November 15, 2017, the Debtors filed their *Emergency Motion for Entry of an Order Further Continuing the Confirmation Hearing* [ECF No. 615] requesting a further continuation of the Confirmation Hearing while the described discussions continued.   On November 16, 2017, the Court entered an order continuing the Confirmation Hearing to November 29, 2017 [ECF No. 625].

---

[5]     C&G Welding filed Proof of Claim No. 139 against MOC, asserting a purported secured claim of $358,888 and a purported unsecured claim of $583,105.80.   Alliance Energy Services, LLC filed Proof of Claim No. 156 against MOI, asserting a purported secured claim of $7,404,467.81 and a purported unsecured claim of $3,755,019.50.   Alliance Energy Services also filed Proof of Claim No. 157 against MOC; it is identical to Proof of Claim No. 156.   Oceaneering International, Inc. filed Proof of Claim No. 204 against MOI, asserting a purported secured claim of $2,170,313.73.   Aqueos Corporation filed Proof of Claim No. 144 against MOI asserting a purported secured claim of $2,923,304.   Aqueos Corporation also filed Proof of Claim No. 145 against MOC; it is identical to Proof of Claim No. 144.

28.     Subsequently, MOI, Falcon USA (an indirect subsidiary of SLH), and the First Lien Agent, on behalf of itself and the Lenders agreed in principal regarding a proposed sale of all or substantially all of MOI's assets to the Stalking Horse on terms and conditions that will be agreed to, and memorialized in, the Purchase Agreement, which will be filed shortly and in advance of the hearing on the Motion.  Specifically, it is contemplated that the First Lien Agent and Lenders will support the Stalking Horse on terms and conditions that will be set forth in a claims assignment agreement (the "Claims Assignment Agreement") among Falcon USA, the First Lien Agent and the Lenders, which the parties will enter into substantially simultaneously with the entry into the Purchase Agreement and prior to the hearing on the Motion, and which such agreement will be filed with the Court.  The parties contemplate that the terms of such Claims Assignment Agreement will provide that the First Lien Agent and the Lenders will sell, assign and transfer all of their respective rights, title, interests and obligations in, to and under the DIP Facility and the First Lien Facility, as applicable, against the Debtor to the Stalking Horse to effectuate the Stalking Horse's purchase of the Purchased Assets, in exchange for the Stalking Horse, at the closing of the Proposed Transaction, entering into, as borrower, and consummating a new consolidated credit facility.  Such sale, assignment and transfer will be effectuated immediately prior, and subject, to the closing of the Proposed Transaction (conditioned upon the closing of the Proposed Transaction).

29.     Although the Debtor has already conducted a robust marketing and public sales process pursuant to the Prior Bidding Procedures Order, MOI proposes to engage in an additional but expedited marketing process, with the Proposed Transaction as the Stalking Horse Bid, in an effort to sell all or substantially all of its assets on the best terms possible.  With the assistance of the Debtor's investment banker and financial advisor, Houlihan Lokey, Inc.

("Houlihan Lokey"), upon the filing of this Motion, MOI will remarket its assets to financial and strategic buyers, many of whom already have been contacted in connection with the Prior Bidding Procedures Order.  *See Boone Decl.* ¶16.

### THE NEED FOR A TIMELY SALE PROCESS

30.     The need for a prompt sale process is driven, in large part, by the Debtor's severe liquidity crisis.  As the Debtor's recently filed Monthly Operating Report [ECF No. 634] reflects, the Debtor's cash position continues to decline, as does its availability under the DIP Facility, which will need to be further drawn down shortly for the Debtor to continue to meet its administrative obligations.  *See Boone Decl.* ¶ 14.  At this point, given the risk of loss to litigate the Asserted Maritime Lien Claims and the associated withdrawal of support for the Plan from certain of the Debtor's key constituencies, the only value-maximizing path forward is the presently proposed process.  There is simply no viable alternative to the process described herein that can be consummated in a sufficient period of time and that can provide as little risk of approval as possible.

31.     Absent the sale process and transactions contemplated by this Motion, MOI believes that it will be unable to realize the maximum value of its assets.  Thus, a prompt sale is necessary to ensure that such assets are sold at their going concern values.

### THE PROPOSED TRANSACTION

32.     As will be set forth more fully, and memorialized, in the Purchase Agreement, MOI desires to sell to the Stalking Horse, and the Stalking Horse desires to purchase from MOI, the Purchased Assets.  The Proposed Transaction contemplates that the purchase price includes, among other things, the Credit Bid.  Unlike the Prior Proposed Transaction, under the Proposed Transaction, existing equity will not receive any percentage of the interest in the buyer.

33. The parties are working diligently to memorialize the terms and conditions of the Purchase Agreement, which the Debtor expects to file as soon as possible after the date hereof and in advance of the hearing on the Motion. The material terms of the Purchase Agreement will include the following:[6]

| | |
|---|---|
| **Purchase Price** | • The purchase price for the Purchased Assets (as may be adjusted pursuant to the terms and conditions of the Purchase Agreement) shall be: (x) $131,099,286.35 (the "Credit Bid Amount"), representing the expected outstanding obligations and indebtedness of MOI under the DIP Facility and the First Lien Credit Agreement as of the Closing Date, to be satisfied in the form of a credit bid pursuant to section 363(k) of the Bankruptcy Code (the "Credit Bid"), and (y) the release of the liabilities arising under the DIP Facility and First Lien Credit Agreement equal to the Credit Bid Amount. |
| **Purchased Assets** | • Substantially all of MOI's assets and properties used or held for use in MOI's business, wherever located and whatever kind and nature, tangible or intangible, including, but not limited to, the MOI Vessels, capital spares, all promissory notes and commercial accounts receivable of MOI, customer account information, licenses, permits, personal and intellectual property, goodwill, going concern value, state and common law claims, and causes of action that previously belonged to MOI or its estate, other than those assets and contracts that are specifically designated in the Purchase Agreement as excluded assets. |
| **Closing & Closing Date** | • The closing of the Proposed Transaction (the "Closing") will occur on a date (the "Closing Date") that is as soon as practicable after the Auction Date (defined below), but no later than sixty (60) days after the issuance of the Sale Order (the "Outside Date"), unless otherwise agreed by Falcon USA and the Debtor |
| **Excluded Assets** | • Any assets not included as Purchased Assets, including, without limitation, all capital stock or ownership interest of MOI or any of its Subsidiaries or Affiliates and all contracts and leases other than those specifically designated by the buyer as Purchased Assets. |
| **Assumed and Excluded Liabilities** | • Falcon USA will not assume any liabilities or obligations of the Debtor, except for the following:<br>   ○ liabilities related to the Purchased Assets arising <u>on and</u> |

---

[6]   This summary of the terms of the Purchase Agreement is qualified in its entirety by reference to the terms and conditions of the Purchase Agreement itself. In the event of any conflict or inconsistency, the terms and conditions of the Purchase Agreement shall control in all respects. Capitalized terms used but not otherwise defined within this summary of the Purchase Agreement have the meanings ascribed to them in the Purchase Agreement.

| | |
|---|---|
| | <u>after the closing date</u> of the Proposed Transaction, as expressly set forth in the Purchase Agreement;<br><br>○ any cure amounts under any assumed contracts;<br><br>○ wind-down expenses of MOI allocated to (and agreed upon by) Falcon USA under the Liquidating Plan and Budget, which amount of wind-down expenses shall be paid using, and shall in no event exceed an amount equal to, the aggregate amount of commercial accounts receivable included in the Purchased Assets *and actually collected and received by Falcon USA*; and<br><br>○ any other liabilities as specifically set forth in the Purchase Agreement. |
| **Break-Up Fee & Expense Reimbursement** | • The Break-Up Fee will be 3% of the Credit Bid Amount.<br><br>• The Expense Reimbursement to Falcon USA for its reasonable out-of-pocket costs, fees and expenses (including reasonable legal, financial advisory, accounting and other similar costs, fees and expenses) incurred in connection with the Purchase Agreement or the Proposed Transaction, is subject to an aggregate cap of $1 million (which may be increased with Court approval).<br><br>• As will be more fully described in the Purchase Agreement, the parties anticipate that the Break-up Fee and the Expense Reimbursement shall be paid by MOI to Falcon USA within five (5) Business Days following the earliest to occur of:<br><br>○ (i) the Bankruptcy Court's approval of a Competing Transaction;<br><br>○ (ii) MOI consummating a Competing Transaction;<br><br>○ (iii) the termination of the Purchase Agreement by the buyer for a breach of any representation, warranty, covenant or agreement in the Purchase Agreement that prevents the satisfaction of certain conditions to the obligations of Falcon USA to consummate the transactions; and<br><br>○ (iv) the termination of the Purchase Agreement for any reason and, if at the time of such termination, Falcon USA would have been permitted to terminate the Purchase Agreement for the reasons described in clause (iii) above. |

## THE BIDDING PROCESS AND AUCTION

34.     In the exercise of its business judgment, MOI believes that it is in the best interests of its estate to subject the proposed transactions with the Stalking Horse to an open-

market bidding process to ensure that maximum value is received for MOI's business and assets. To that end, MOI seeks authority to solicit competing offers for the Purchased Assets.

35.     The proposed Bidding Procedures are substantially similar to the Prior Bidding Procedures approved by this Court and are designed to provide MOI with the flexibility necessary to allow for the maximization of the value of the Purchased Assets.  Further, the Bidding Procedures reflect MOI's goal of conducting the bidding process in a controlled, fair, and open manner.

36.     Specifically, the Bidding Procedures benefit MOI's estate by creating a process that ensures, among other things: (a) structure and logistical integrity to the process; (b) MOI's ability to compare the relative values of competing offers, if any; (c) that potential purchasers have the financial wherewithal to timely consummate a sale transaction; and (d) competitive bidding.

37.     The Bidding Procedures prescribe the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence by prospective bidders, the deadline and requirements for submitting a bid, the method and criteria for bids to become "Qualified," the manner in which qualified bids will be negotiated, clarified, and improved, and the criteria for selecting Winning Bidders, including if necessary, through a public auction.

38.     The following is a summary of the proposed Bidding Procedures:

### Summary of Bidding Procedures[7]

**Participation**                    To participate in the bidding process, each Potential Bidder must first

---

[7]     Capitalized terms used in the summary below but not defined herein shall have the meanings ascribed to them in the Bidding Procedures. This is a summary only and is not a full recitation of the Bidding Procedures. Interested parties are encouraged to read the Bidding Procedures in their entirety and not rely on this summary. To the extent that the Motion and Bidding Procedures are inconsistent, the Bidding Procedures shall control.

| | |
|---|---|
| **Requirements:** | deliver the following materials to MOI and MOI's investment banker, Houlihan Lokey, Attn: Michael H. Boone (MBoone@HL.com):  (a) an executed Confidentiality Agreement; and (b) written evidence of the Potential Bidder's financial, operational and other ability to close the Competing Transaction on the same schedule and provide adequate assurance of future performance under all contracts and leases to be assumed. |
| **Due Diligence:** | Any Potential Bidder wishing to conduct due diligence concerning a Competing Transaction shall be granted (a) reasonable access to the Debtor's management during normal business hours and (b) access to all relevant information regarding the business of the Debtor reasonably necessary to enable a Potential Bidder to evaluate the Competing Transaction.  The Debtor shall make such document access available to Potential Bidders through an electronic data room as soon as reasonably practicable following execution of the Confidentiality Agreement. Potential Bidders interested in conducting due diligence should contact the Debtor's investment banker, Houlihan Lokey, Attn: Michael H. Boone    (phone:    214.220.8497;    email:    MBoone@HL.com). Notwithstanding the foregoing, Houlihan Lokey is not required to provide confidential, business-sensitive or proprietary information to any person if the Debtor reasonably believes that such disclosure would be detrimental to the interests of the Debtor's estate.  All due diligence must be completed before the Bid Deadline (as defined below).    No condition(s) allowing or regarding further due diligence will be accepted after the Bid Deadline unless otherwise reasonably determined by the Debtor and its advisors.  Potential Bidders are required to exercise their own discretion before relying on any information provided by the Debtor regarding the Competing Transaction.  Neither the Debtor nor any of its representatives or advisors are responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders pursuant hereto. |
| **Bid Deadline:** | Any Potential Bidder interested in proposing a Competing Transaction must submit a Bid prior to **4:00 p.m. prevailing Central Time on December 14, 2017**. |
| **Qualified Bids:** | In order for a Bid to be considered, it must be a "Qualified Bid."  A Potential Bidder will be deemed to be a "Qualified Bidder" if the Debtor and its advisors, in their sole discretion and following consultation with the Official Committee of Unsecured Creditors (the "Committee") and the agent under the First Lien Facility and the DIP facility (solely in its capacity as such), determine that such Potential Bidder submitted a Qualified Bid.  For the avoidance of doubt, the Stalking Horse is a Qualified Bidder and its Bid is a Qualified Bid. |
| **Qualified Bid** | A Bid will be considered a "Qualified Bid" only if the Bid satisfies each |

**Requirements;**
**Deposit:**
of the following requirements (capitalized terms used in this section are defined in the Bidding Procedures):

      a.    The Bid contains terms that in the Debtor's business judgment, after consultation with Chase, or the Committee's independent determination (i) has a value greater than $136,132,264.94 and (ii) proposes an alternative transaction that provides substantially similar or better terms than the Proposed Transaction; *provided, however*, that bidders may also submit Bids for individual assets or a combination of assets (each a "Partial Bid"). The Debtor, in its business judgment (after consultation with Chase), or the Committee, in its reasonable discretion, will determine whether such Partial Bids qualify as Qualified Bids; *provided, that*, to be considered a Qualified Bid, the Debtor or the Committee must reasonably conclude that a Partial Bid, when taken together with other Partial Bids, satisfies the criteria for being a Qualified Bid;

      b.    The Bid provides that it shall remain irrevocable until the Back-Up Bid Expiration Date (defined below);

      c.    The Bid is made by a person or entity that reasonably demonstrates evidence of fully committed and firm financing in support of such Bid and other ability to consummate the Competing Transaction, in each case acceptable to the Debtor in its sole discretion, following consultation with the Committee and Chase;[8]

      d.    The Bid provides for an outside closing date for the Competing Transaction of sixty (60) days following entry of the Sale Order in respect of such Bid;

      e.    The Potential Bidder provides written evidence that it has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of the agreements associated therewith, or a representation that no such authorization or approval is required;

      f.    The Bid provides that any cash portion of the purchase price will be paid in cash, cash equivalents, or such other consideration acceptable to the Debtor in its sole discretion

---

[8]    For purposes of these Bidding Procedures, to the extent that any Bid proposes to pay, in cash, to Chase, for the benefit of the lenders under the DIP Facility and the First Lien Credit Agreement, the full amount of outstanding obligations and indebtedness of MOI under the DIP Facility and the First Lien Credit Agreement, then Chase's consultation rights shall be abrogated as to such Bid.

following consultation with the Committee and Chase;

g.      The Potential Bidder provides by wire transfer of immediately available funds to the Debtor or its designee before the Bid Deadline of an earnest money cash deposit (the "Deposit") of not less than five percent (5%) of the total consideration provided under the Bid;

h.      The Potential Bidder provides evidence reasonably satisfactory to the Debtor following consultation with the Committee and Chase that the Potential Bidder is reasonably likely to obtain regulatory approval, if any is required, promptly and prior to consummating the Competing Transaction;

i.      The Bid is submitted in the form of a legally binding agreement (the "Bidder Agreement"), which shall be in the form of an asset purchase agreement for the purchase of some or all of the Debtor's assets, fully executed by the Potential Bidder in a clean copy and marked to show the proposed changes to the Purchase Agreement in a redlined copy, that further:

i.      identifies the Potential Bidder and any Affiliates who are also submitting a Bid (even if not members of the same investor group), if applicable;

ii.      is not subject to any conditions, representations, or terms not included in the Purchase Agreement that the Debtor determines to be unacceptable;

iii.      describes with specificity the total consideration proposed to be paid to MOI's estate in the Competing Transaction;

iv.      is not conditioned upon the Bankruptcy Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment;

v.      is not conditioned upon tax or other due diligence;

vi.      does not contain any condition to closing of the Competing Transaction relating to the receipt of any third-party approvals (excluding required Bankruptcy Court approval and any required governmental and/or regulatory approval or third-party consents required under the Purchase Agreement);

vii.     expressly acknowledges and represents that the Potential Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Competing Transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents in making its Bid or that of any of its legal, financial or other advisors, and (C) did not rely upon any written or oral statements representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtor or the Competing Transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Bidder Agreement ultimately accepted and executed by the Debtor;

viii.     identifies each and every executory contract and unexpired lease that the Potential Bidder MOI desires to assume or reject and provides evidence of such Potential Bidder's ability to provide adequate assurance of future performance of the contracts or leases to be assumed (as required by section 365(b)(1)(C) of the Bankruptcy Code); and

ix.     contains other information reasonably required by the Debtor and its advisors, following consultation with the Committee and Chase, to evaluate the Bid.

The Debtor reserves the right to waive noncompliance with any bid requirement.

**Auction:**     After the Bid Deadline, the Debtor and its advisors, following consultation with Chase, and independently, the Committee, shall determine which Bids, if any, are Qualified Bids and which of the Qualified Bids represent(s) the then-highest or otherwise best Bid for a Competing Transaction (the "<u>Initial Highest Bid</u>" and the entity submitting such Bid, the "<u>Initial Highest Bidder</u>"). The Debtor and its advisors, in their sole discretion and following consultation with the Committee and Chase, may consider a bid or bids on individual or groups of the Debtor's assets as a Qualified Bid, and may designate one or a combination of such bids as the Initial Highest Bid. At least one (1) business day prior to the Auction, each Qualified Bidder that timely submitted a Qualified Bid (including, for the avoidance of doubt, the Stalking Horse) will be advised of such Initial Highest Bids and the Debtor shall distribute copies of such Initial Highest Bids (with the identities of other Qualified Bidders redacted) to the Committee and to

other Qualified Bidders who have submitted Qualified Bids.

If one or more Qualified Bids has been submitted for a Competing Transaction in accordance with these Bidding Procedures, the Debtor will conduct an Auction on **December 15, 2017, at 10:00 a.m. (prevailing Central Time)**, with respect to such Qualified Bids in order to determine the highest and best Bid(s) (the "<u>Winning Bid(s)</u>") to submit for approval by the Bankruptcy Court at the Sale Hearing (as defined below).

The only persons or entities who will be permitted to bid at the Auction are the authorized representatives of each Qualified Bidder (the "<u>Auction Participants</u>"). While only the Auction Participants may bid at the Auction, the Auction may be attended and viewed also by the Debtor and a representative of the Committee and Chase, and their respective advisors and/or other authorized representatives. Any other person wishing to attend the Auction may do so by contacting counsel to the Debtor, David Avraham at david.avraham@dlapiper.com, no later than three (3) days prior to the start of the Auction.

Each Qualified Bidder shall be required to represent that it has not engaged in any collusion with respect to the marketing process or the Competing Transaction.

The Auction shall be conducted by the Debtor in accordance with such procedures and requirements as may be established at the discretion of the Debtor and its advisors following consultation with the Committee and Chase to result in the highest or otherwise best offer for the Purchased Assets, which rules shall be announced prior to commencement of the Auction, and may include the determination of the amount of time between making qualified bids, the conducting of multiple rounds of open bidding, and the right to declare that the Auction has ended when no further Bids are timely made or otherwise. Following consultation with the Committee and Chase, the Debtor may waive and/or employ and announce at the Auction additional rules that are reasonable under the circumstances for conducting the Auction provided that such rules are: (a) not inconsistent with the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules of the Bankruptcy Court, or any order of the Bankruptcy Court entered in connection with the Debtor's Bankruptcy Case; (b) disclosed to each Auction Participant; and (c) do not modify the provisions of the Bidding Procedures or Purchase Agreement.

The first Qualified Bid at the Auction shall be deemed to have been made by the Initial Highest Bidder, in the amount of the Initial Highest Bid. Thereafter, the Auction will continue in the manner determined by the Debtor above; *provided, however*, that additional Bids must be (i) Qualified Bids (except that such subsequent additional or revised

Qualified Bids made at the Auction need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in higher increments of at least $100,000 in cash or other assets (each, a "Minimum Bid Increment").

The Debtor shall determine following consultation with the Committee and Chase, subject to final determination(s) by the Bankruptcy Court as to the Winning Bid(s) and the Winning Bidder(s), whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

At the conclusion of the Auction, the Debtor, following consultation with the Committee and Chase, shall: (i) select the Winning Bid and the Back-Up Bid; (ii) notify the person(s) that made the Winning Bid (the "Winning Bidder") and the Back-Up Bid of such selection; and (iii) file a notice with the Bankruptcy Court announcing the Winning Bidder and request a hearing for approval of same on **December 19, 2017 at 3:00 p.m.** (prevailing Central Time) (such hearing, the "Sale Hearing").

A Winning Bidder shall, within one (1) business day after the close of the Auction, submit to the Debtor fully executed revised documentation memorializing the terms of the Winning Bid (unless otherwise extended by the Debtor in writing). Promptly following the submission of such documentation, the Debtor shall file with the Bankruptcy Court notice of the Winning Bid and Winning Bidder. The Winning Bid may not be assigned to any party without the consent of the Debtor after consultation with the Committee.

Each Winning Bidder's Deposit (if not the Stalking Horse) shall be applied by the Debtor against the purchase price to be paid by such Winning Bidder or held by the Debtor and forfeited, as the case may be.

The Debtor shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtor's acceptance thereof have been authorized by order of the Bankruptcy Court following the conclusion of the Sale Hearing.

If an Auction is conducted, the Qualified Bidder or, in the case of a joint bid or bidders, Qualified Bidders with the next highest or otherwise best Qualified Bid (including the Stalking Horse, if applicable) (the "Back-Up Bid"), whether an individual bid or a joint bid, as the case may be, determined by MOI in the exercise of its business judgment, after consultation with the Committee and Chase, at the Auction shall be required to serve as back-up bidders (the "Back-Up Bidders") and keep such bid open and irrevocable until the Back-Up Bid Expiration Date (defined below). Following the Sale Hearing, if the Winning Bidder fails to consummate the approved sale because of a breach or failure to

perform on the part of such Winning Bidder, the Back-Up Bidders will be deemed to be the new Winning Bidder, and the Debtor will be authorized, but not required, to consummate the sale with the Back-Up Bidders without further order of the Bankruptcy Court.

Except to the extent otherwise provided in the Purchase Agreement, the Back-Up Bid shall remain open and irrevocable until the first to occur of (i) consummation of the transaction with a Winning Bidder, (ii) the Debtor's release of the bidder's obligations to serve as the Back-Up Bid, (iii) February 20, 2018, and (iv) solely in the event the Stalking Horse Bid is the Back-Up Bid, twenty (20) days after entry of a Sale Order approving the Winning Bid (such date, the "<u>Back-Up Bid Expiration Date</u>"). If the transaction with a Winning Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Winning Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Winning Bid.

**Deposits**          No later than five (5) business days after the Auction, the Debtor (or escrow agent) shall return to each Qualified Bidder (other than the Winning Bidder(s)) its Deposit, plus any interest accrued thereon. Upon the authorized return of such Deposit, the bid of such Potential Bidder shall be deemed revoked and no longer enforceable.

### THE PROPOSED NOTICE PROCEDURES

39.     MOI proposes to serve the Bid Procedures Order and a notice of the Bidding Procedures and the Auction (the "<u>Procedures Notice</u>"), in substantially the form attached to the Bid Procedures Order as <u>Exhibit 2</u>, within one (1) business day after entry of the Bid Procedures Order, upon the Notice Parties (as defined below).

### RELIEF REQUESTED

40.     By this Motion, MOI requests that the Court enter the Bid Procedures Order in substantially the form attached as <u>Exhibit A</u> hereto:  (I) approving (A) the Bidding Procedures annexed as Exhibit 1 to the Bid Procedures Order governing the submission and consideration of competing bids, (B) the Bidding Protections, (C) the form and manner of the Auction, Proposed Transaction, and Sale Hearing, and (D) the procedures for assuming and assigning certain executory contracts or unexpired leases in connection with the Proposed Transaction or a

Competing Transaction, as applicable; (II) (A) authorizing and scheduling the date for an Auction and Sale Hearing, and (B) authorizing the Debtor to enter into the Purchase Agreement to the extent necessary to implement the Bidding Protections; (III) authorizing (A) the sale of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code and (B) the assumption and assignment of certain executory contracts or unexpired leases in connection with the Proposed Transaction or a Competing Transaction, as applicable; and (IV) granting related relief.

## BASIS FOR RELIEF REQUESTED

### A.  The Bidding Procedures Are Reasonable, Appropriate and in the Best Interests of MOI's Estate

41.     The paramount goal of a chapter 11 process is to maximize the proceeds received by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.),* 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 149 (3d Cir. 1986) (noting the fairness and reasonableness of prices); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . debtor's duty . . . is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.),* 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Summit Global Logistics, Inc.,* No. 08-11566, 2008 WL 819934, at *14 (Bankr. D.N.J. Mar. 26, 2008) (describing a proposed transaction as one that "maximize[d] value and return to interested parties"). To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate of a debtor and, therefore, are appropriate. *See Integrated,* 147

B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network Inc.,* 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate.").

42.    With this in mind, courts have deferred to a debtor's business judgment in the context of bidding and auction procedures, *In re Trans World Airlines Inc.,* No. 01-0056, 2001 WL 1820326, at \*10 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor . . . .").

43.    MOI submits that the Bidding Procedures are fair and reasonable and will ensure that the bidding process and any auction (to the extent necessary) will yield the maximum value for the Debtor's estate.   The Bidding Procedures are designed to provide an organized process for the receipt and review of bids from potential purchasers with an ability to close on the sale of the assets and to maximize value to MOI's estate.   The Bidding Procedures also clearly set forth the participation requirements for Qualified Bidders and bid requirements for Qualified Bids (as such terms are defined in the Bidding Procedures).   In addition, the Bidding Procedures are prudently designed to encourage bidding by (i) permitting parties to submit bids for more than one of the Debtor's assets, in any combination and (ii) allowing the Debtor combine bids in order to compete with the Stalking Horse Bid.

44.    Importantly, the Bidding Procedures contemplate a timeline for the additional marketing of assets, submission of qualified bids, and scheduling of a sale hearing that takes into account the Debtor's current liquidity position.   Although on its face that schedule may seem condensed, the fact is that MOI and its advisors have been marketing the Debtor's assets since

before the Petition Date. *See Boone Decl.* ¶20. In light of this extensive pre- and postpetition marketing efforts, the Debtor submits that the schedule contemplated by the Bidding Procedures provides potential bidders with more than sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid. *See id.* Thus, the requested timing strikes the appropriate balance between affording potential bidders sufficient opportunity to submit qualified bids while not unduly prolonging the sale process to the detriment of all stakeholders. The Debtor also believes that the Bidding Procedures afford MOI a reasonable opportunity to consider bids for Competing Transactions. *See id.*

45.     Moreover, the Proposed Transaction sets forth a bidding floor that ensures an acceptable minimum recovery even in the absence of additional market interest in submitting bids for a Competing Transaction. Nonetheless, MOI believes that submitting the Purchase Agreement to a market-based test will ensure that the consideration obtained through the bidding process will be fair and reasonable.

46.     In sum, MOI believes that the proposed Bidding Procedures create an appropriate framework for expeditiously establishing that MOI is receiving the best and highest offer for a sale transaction. Accordingly, the proposed Bidding Procedures are reasonable, appropriate, and within MOI's sound business judgment under the circumstances.

### B.     The Break-Up Fee and Expense Reimbursement Should Be Approved

47.     The Bidding Procedures contain standard bid protections for the Stalking Horse, such as an initial overbid requirement, and the Purchase Agreement is expected to contain additional bid protections (namely, the Break-Up Fee and Expense Reimbursement described herein) (collectively, the "Bidding Protections"). To induce the Stalking Horse to serve in such capacity pursuant to the terms and conditions that will be set forth in the Purchase Agreement,

the Debtor agreed that the Stalking Horse will be entitled to substantially the same bid protections that this Court approved in connection with the Prior Proposed Transaction. To be clear, by this Motion, the Debtor is not seeking to enhance in any way the Bidding Protections already approved by this Court. Specifically, in consideration for and as an inducement to the Stalking Horse to set the floor price for the Proposed Transaction on the terms and conditions that will be set forth in the Purchase Agreement, MOI seeks to pay, in cash to the Stalking Horse (i) a break-up fee (the "Break-Up Fee") in the amount of 3% of the Credit Bid Amount; and (ii) reimbursement to the Stalking Horse for its reasonable out-of-pocket costs, fees and expenses (including reasonable legal, financial advisory, accounting and other similar costs, fees and expenses) incurred in connection with the Purchase Agreement or the Proposed Transaction, subject to an aggregate cap of $1 million (which may be increased with Court approval) (the "Expense Reimbursement"), which such Break-Up Fee and Expense Reimbursement are payable only if certain events occur as summarized above under the section titled "The Proposed Transaction" and more fully described in the Purchase Agreement.

48.     As bankruptcy courts have long recognized, break-up fees and other termination fees are a reasonable, normal and, in many cases, necessary component of significant sales conducted under the Bankruptcy Code:

> Breakup fees are important tools to encourage bidding and to maximize the value of the debtor's assets .... In fact, because the ... corporation ha[s] a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values.

*Integrated,* 147 B.R. at 659-60. Specifically, "[b]reakup fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs. L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (internal quotations omitted); see also *Integrated,* 147 B.R. at 660-61

(noting that break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.,* 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . . due diligence").

49.     Break-up fees are appropriate where they "provide some benefit to the debtor's estate," including (a) "induc[ing] a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely" and (b) promoting more competitive bidding "by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Calpine Corp. v. O'Brien Envt'l. Energy. Inc. (In re O'Brien Envt'l Energy. Inc.),* 181 F.3d 527, 536-37 (3d Cir. 1999). In connection therewith, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.* at 537.

50.     Historically, bankruptcy courts have approved bidding incentives, such as break-up fees and expense reimbursements, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of business judgment. *See O'Brien,* 181 F.3d at 534-35; *Integrated,* 147 B.R. at 657 ("[B]reak-up fee arrangements outside bankruptcy are presumptively valid under the business judgment rule."); *995 Fifth Ave.,* 96 B.R. at 28.

51.     Although bidding incentives in favor of a stalking horse are measured against a business judgment standard, to receive administrative expense priority pursuant to Bankruptcy Code section 503(b), the bidding incentive must provide some postpetition benefit to the estate. *See In re O'Brien Envt'l. Energy, Inc.*, 181 F.3d at 533. The *O'Brien* court identified two

instances in which such a benefit to the estate may be found.  The first instance is where the incentive promoted a more competitive bidding process, "such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537.  The second instance is where bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as the floor bid on which other bidders can rely.  *Id*. at 535 ("We . . . conclude that the determination whether break-up fees or expenses are allowable under §503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.  Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context.  Nonetheless, the considerations that underlie the debtor's judgment may be relevant to the Bankruptcy Court's determination on a request for break-up fees and expenses.").

52.     The terms of the Bidding Protections are the product of extensive, good faith, arm's-length negotiations between MOI and the Stalking Horse.  MOI believes that the Break-Up Fee and Expense Reimbursement reflect the most favorable terms achievable by MOI under the circumstances and will serve their intended purpose to compensate the Stalking Horse for the risk, time, and expense of serving in that role.

53.     The Stalking Horse would not enter into the Purchase Agreement (expected to be finalized soon after the filing of this Motion) without continued assurance that it is entitled to substantially the same Bidding Protections already approved by this Court.  These protections were used by MOI to, among other things, encourage the Stalking Horse to consider the value of MOI's business in light of its current financial condition and of the risks associated with the

current status of the chapter 11 case and convert that value to a dollar figure on which other bidders could rely, and submit a bid without which bidding for a sale transaction might be more limited or non-existent. *See, e.g., Integrated,* 147 B.R. 650; *995 Fifth Ave.,* 96 B.R. at 28. The Bidding Protections will compensate the Stalking Horse for the benefit it provides to MOI's estate in the event the Bidding Procedures elicits one or more additional Qualified Bids. Moreover, to have MOI's business and assets validated by the existence of the Purchase Agreement to be memorialized provides other potential bidders with a clear, objective basis against which to measure the value of the Purchased Assets. The existence of the Purchase Agreement that is expected to be finalized provides an essential signal to the market that, despite MOI's recent challenges, there is value in the Purchased Assets.

54. Additionally, the proposed Bidding Protections are within the range of such fees approved by this and other courts. Accordingly, MOI believes that the Bidding Protections are reasonable, appropriate and necessary to preserve and enhance the value of its estate. For the reasons set forth above, MOI respectfully requests approval of the Bidding Protections with respect to the Proposed Transaction.

### C.    Proposed Notice Is Appropriate

55. A debtor is required to notify its creditors of any proposed sale of its assets, including a disclosure of the time and place of an auction, the terms and conditions of the sale, and the deadline for filing any objections. MOI submits that the Procedures Notice fully complies with Bankruptcy Rule 2002 and other applicable Bankruptcy Rules, and includes information regarding the Bidding Procedures necessary to enable interested parties to participate in the Auction.

56.     MOI further submits that the notice to be provided through the Procedures Notice of the Bidding Procedures and the method of service proposed herein constitutes good and adequate notice of the Bidding Procedures and the other components of MOI's receipt and consideration of competing and supplemental bids for a Competing Transaction.   Therefore, MOI respectfully requests this Court approve the foregoing notice procedures.

### D.     The Proposed Transaction Is Appropriate Under Section 363 of the Bankruptcy Code

57.     A sale of a debtor's assets under section 363 of the Bankruptcy Code is appropriate if a sound business purpose exists for the proposed transaction.  *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 423 (Bankr. S.D. Tex. 2009); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)) (explaining that the business judgment rule, the principles of which have "'vitality by analogy' in Chapter 11," is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company").

58.     Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interest parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith.  *See In re GMC*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (Bankr. D. Del. 1991).

#### 1.     *Sound Business Justification*

59.     Ample business justification exists in this case to approve the Proposed Transaction or any Competing Transaction.  Following the November 8 Ruling, MOI has, with

the assistance of its advisors, considered all alternatives, and determined that the immediate sale of all or substantially all of its assets is the only viable path to emergence.  Given its current financial position, MOI believes that a sale of all or substantially all of its assets must be completed in the timeframe described herein.  In light of this decision, MOI expects to prosecute a liquidating plan to ensure an orderly wind-down of its estate.  At this time, however, MOI is simply asking the Court to find that the sale of all or substantially all of MOI's assets under section 363 of the Bankruptcy Code is appropriate.

60.     MOI submits that the Winning Bid will constitute the highest or otherwise best offer for the Purchased Assets under the current circumstances.   Accordingly, MOI's determination to sell the Purchased Assets through the Bidding Procedures and subsequently to enter into a purchase agreement reflecting the Winning Bid (including, as applicable, the Purchase Agreement) will be a valid and sound exercise of MOI's business judgment.  As applicable, MOI will submit evidence at the Sale Hearing to support these conclusions. Therefore, MOI requests that the Court find that the proposed sale of the Purchased Assets is a proper exercise of its business judgment.

### 2.     *Adequate and Reasonable Notice*

61.     MOI submits that the Procedures Notice fully complies with Bankruptcy Rule 2002 and other applicable Bankruptcy Rules, and includes information regarding the Bidding Procedures necessary to enable interested parties to participate in the Auction.  The Procedures Notice provides reasonable and appropriate notice of the date, time and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Bidding Procedures, the Proposed Transaction, and/or any Competing Transaction; and (c) otherwise includes all information relevant to parties interested in or affected by the Bidding Procedures, the Proposed

Transaction, and/or any Competing Transaction.  Significantly, the Procedures Notice will have been approved by this Court pursuant to the Bid Procedures Order before it is served on other parties in interest.

### 3.   *Fair and Reasonable Sale Price*

62.    MOI believes that the purchase price to be offered by the Stalking Horse is fair and reasonable, but the Court and parties in interest will be assured at the Sale Hearing that, following extensive pre- and postpetition marketing of the Debtor's assets, the Debtor will have selected the party/parties with the highest or best offers for their assets.  Indeed, the Bidding Procedures and Auction will deliver a fair value transaction.  Courts routinely find that, where there is a court-approved bidding process, a full and fair price is presumed to have been obtained for the assets sold because the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999).  Here, MOI seeks to enter into the Proposed Transaction with the Stalking Horse in order to establish a pricing floor for the Purchased Assets.  Furthermore, as noted, Houlihan will continue to market the Purchased Assets and solicit offers consistent with the Bidding Procedures, including, for example, by contacting previously solicited parties and otherwise assisting MOI with all efforts to increase transaction value.  Bids will be considered for the Purchased Assets in various combinations to determine the best means to generate the highest and best value for MOI's estate.  This public and open marketing process will, MOI submits, establish fair value for the Purchased Assets.

### 4.   *Good Faith*

63.    MOI has proposed the Bidding Procedures in good faith and intends to negotiate with all Qualified Bidders in good faith and at an arm's length with respect to any Competing

Transaction.  Based upon the record to be made at the Sale Hearing, the Debtor will request a finding that the Winning Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code.

64.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor.  Specifically, section 363(m) provides that

> [t]he reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Chateaugay Corp.*, Case No. 92 CIV. 7054 (PKL), 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).  MOI will submit evidence as necessary at the Sale Hearing to demonstrate that the Winning Bidder is a "good faith purchaser" entitled to the protections of section 363(m) of the Bankruptcy Code.

**E.     Sale of Assets Free and Clear of Liens, Claims, and Encumbrances**

65.     In the interest of attracting the best offers, any sale of the Purchased Assets, should be free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims and encumbrances attaching to the proceeds of the Proposed Transaction or a Competing Transaction, as applicable.  Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

66.     It has been long established that a bankruptcy court has the authority, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of a debtor's assets free and clear of any claims against the debtor.  *See United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 585 (4th Cir. 1996) (holding that successor liability claims are "interest in property" under section 363(f)).

67.     MOI submits that with respect to any party asserting a lien, claim, or encumbrance of its assets (including the Asserted Maritime Lien Claims), it will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  No prepetition creditor other than the Lenders has a valid first priority security interest in the assets to be sold (any interest asserted by the holders of Asserted Maritime Lien Claims is junior to the lenders and is in bona fide dispute).  To the extent any other such creditors exist, MOI will provide all creditors notice of the proposed sale and an opportunity to object, and absent objection any such creditor will be deemed to have consented to such sale.  Further, MOI believes that any party that may hold a lien on the Purchased Assets could be compelled to accept a monetary satisfaction of such interest, and such interest will attach to the net proceeds of the sale *with the same validity and in the same relative priorities established under applicable non-bankruptcy law*.

68.     Accordingly, MOI submits that the Proposed Transaction will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and should be approved free and clear of all liens, claims, and encumbrances (including any Asserted Maritime Lien Claims).

F.     **Assumption and Assignment of Executory Contracts and Unexpired Leases**

69.     In connection with the proposed sale of the Debtor's assets, MOI may assume and assign any executory contacts or unexpired leases included in the Winning Bidder's purchase agreement.  Section 365 of the Bankruptcy Code allows a debtor to maximize the value of its estate by assuming executory contracts and unexpired leases that benefit the estate and by rejecting those that do not.  *See COR Route 5 Co., LLC v. The Penn Traffic Co. (In re The Penn Traffic Co.)*, 524 F.3d 373, 382 (2d Cir. 2008).  "As long as assumption … appears to enhance a debtor's estate, court approval of a debtor[]'s decision to assume … should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code[.]"  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation omitted).

70.     The assumption and assignment of certain executory contracts or unexpired leases may comprise an important component of the sale of the Purchased Assets.  It is thus an appropriate exercise of business judgment for MOI to agree to assume and assign any such contracts or leases that the Winning Bidder desires to purchase.

71.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts turn to an evaluation of whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code.  That is, section 365 of the Bankruptcy Code authorizes the assumption of executory contracts and unexpired leases only when the debtor has (i) cured, or provided

adequate assurance of promptly curing, prepetition defaults under such contracts and leases, (ii) compensated parties for pecuniary losses arising therefrom, and (iii) provided adequate assurance of future performance thereunder. *See* 11 U.S.C. § 365(b)(1). Upon satisfaction of the requirements of section 365(b), a debtor may assume an executory contract or unexpired lease where adequate assurance of future performance has been provided. *See* 11 U.S.C. §§ 365(f)(2).

72.     MOI submits that the statutory requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code will be satisfied because the contemplated Purchase Agreement will require the Winning Bidder to cure all defaults associated with, or that are required to properly assume any executory contract or unexpired lease that constitutes a Purchased Asset (if any). While MOI does not yet know which, if any, of its contracts and leases will require assumption and assignment, it will provide the parties to any such contract or lease with notice and an opportunity to object, as well as adequate assurance.

73.     At the Sale Hearing, to the extent necessary, the Debtor will be prepared to proffer testimony or present evidence to demonstrate the ability of each Winning Bidder to perform under the applicable transferred contracts. The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of each Winning Bidder to provide adequate assurance of future performance, as required by section 365(b)(1)(C) of the Bankruptcy Code.

74.     To facilitate the assumption and assignment of any transferred contacts, the Debtor further requests the Court find all anti-assignment provisions of the applicable transferred contracts to be unenforceable under section 365(f) of the Bankruptcy Code.

### G.  Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rule 6004(h)

75.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

76.     Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, commentators agree that the stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  *See generally* 10 Collier on Bankruptcy ¶ 6004.11 (16th ed. 2015).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  *Id*.

77.     If the effectiveness of the Bid Procedures Order is unduly delayed it will impair MOI's ability make the best use of the limited time available to MOI to market its business and assets.  This would directly prejudice MOI's estate by reducing the likelihood that MOI will receive and be able to consummate a sale transaction.  Moreover, MOI's current financial position necessitates a sale on an expedited basis.  Consequently, any order approving the Purchase Agreement or a purchase agreement with a Winning Bidder other than the Stalking Horse also should be effective immediately upon entry of such order and that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## NOTICE

78.    Notice of this Motion will be given by overnight courier delivery to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Committee; (c) counsel to the Stalking Horse; (d) counsel to the First Lien Agent; and (e) all parties who have requested notice under Bankruptcy Rule 2002 (collectively, the "Notice Parties").  MOI submits that, under the circumstances, no other or further notice is required.

WHEREFORE, MOI respectfully requests that the Court enter the Bid Procedures Order in substantially the form attached as Exhibit A hereto:  (I) approving (A) the Bidding Procedures annexed as Exhibit 1 to the Bid Procedures Order governing the submission and consideration of competing bids, (B) the Bidding Protections, (C) the form and manner of the Auction, Proposed Transaction, and Sale Hearing, and (D) the procedures for assuming and assigning certain executory contracts or unexpired leases in connection with the Proposed Transaction or a Competing Transaction, as applicable; (II)(A) authorizing and scheduling the date for an Auction and Sale Hearing, and (B) authorizing the Debtor to enter into the Purchase Agreement to the extent necessary to implement the Bidding Protections; (III) authorizing (A) the sale of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code and (B) the assumption and assignment of certain executory contracts or unexpired leases in connection with the Proposed Transaction or a Competing Transaction, as applicable; and (IV) granting related relief.

*[Remainder of Page Intentionally Left Blank]*

Dated:  November 24, 2017
     Dallas, Texas

**DRINKER BIDDLE & REATH LLP**

By: */s/ Vincent P. Slusher*
    Vincent P. Slusher (State Bar No. 00785480)
    1717 Main Street, Suite 5400
    Dallas, Texas 75201
    Telephone: (469) 357-2500
    Facsimile: (469) 327-0860
    vince.slusher@drinkerbiddle.com

    -and-

**DLA PIPER LLP (US)**

    Daniel M. Simon (admitted *pro hac vice*)
    David E. Avraham (admitted *pro hac vice*)
    444 W. Lake Street, Suite 900
    Chicago, Illinois 60606-0089
    Telephone: (312) 368-4000
    Facsimile: (312) 236-7516
    daniel.simon@dlapiper.com
    david.avraham@dlapiper.com

    *Attorneys for the Debtors*