# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | § Case No. 17-31646 |
| MONTCO OFFSHORE, INC., *et al.*,[1] | § Chapter 11 |
| Debtors. | § (Jointly Administered) |

**DECLARATION OF MICHAEL BOONE IN SUPPORT OF EMERGENCY MOTION OF DEBTOR MONTCO OFFSHORE, INC. FOR AN ORDER (I) APPROVING (A) BIDDING PROCEDURES GOVERNING SUBMISSION AND CONSIDERATION OF COMPETING TRANSACTIONS, (B) BID PROTECTIONS, (C) FORM AND MANNER OF NOTICE OF SALE TRANSACTION AND SALE HEARING, AND (D) ASSUMPTION AND ASSIGNMENT PROCEDURES FOR ANY TRANSFERRED CONTRACTS; (II) (A) SCHEDULING AND AUTHORIZING DEBTOR TO CONDUCT AN AUCTION PURSUANT TO THE BIDDING PROCEDURES AND SCHEDULING SALE HEARING, AND (B) AUTHORIZING DEBTOR TO ENTER INTO THE PURCHASE AGREEMENT TO IMPLEMENT BIDDING PROTECTIONS; (III) AUTHORIZING (A) THE SALE OF THE PURCHASED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (B) THE ASSUMPTION AND ASSIGNMENT OF ANY TRANSFERRED CONTRACTS; AND (IV) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Michael Boone, declare:

1. I am over the age of 18 and competent to testify.

2. I make these statements of (i) my own personal knowledge; (ii) my review of relevant records maintained by Houlihan Lokey, Inc. (together with its wholly owned subsidiaries, agents, independent contractors, and employees, "Houlihan") in the ordinary course of its retention as financial advisor and investment banker to the above-captioned debtors (the "Debtors");

---

[1] The Debtors in these chapter 11 cases, together with the last four (4) digits of each Debtor's federal tax identification number, are Montco Offshore, Inc. ("MOI") (1448) and Montco Oilfield Contractors, LLC ("MOC") (9886). The mailing address for the Debtors, solely for the purposes of notices and communications, is 17751 Hwy 3235, Galliano, Louisiana 70354.

(iii) my view, based upon my experience and knowledge of the Debtors' businesses and financial condition; (iv) my review of the Motion and other pleadings referred to herein; and (v) my consultation with employees of, and other advisors to, the Debtors. If called to testify, I would testify competently to the truth of the matters set forth herein.

3. I submit this declaration in support of *Emergency Motion of Debtor Montco Offshore, Inc. for an Order (I) Approving (A) Bidding Procedures Governing Submission and Consideration of Competing Transactions, (B) Bid Protections, (C) Form and Manner of Notice of Sale Transaction and Sale Hearing, and (D) Assumption and Assignment Procedures for Any Transferred Contracts; (II) (A) Scheduling and Authorizing Debtor to Conduct an Auction Pursuant to the Bidding Procedures and Scheduling Sale Hearing, and (B) Authorizing Debtor to Enter Into the Purchase Agreement to Implement Bidding Protections; (III) Authorizing (A) the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (B) the Assumption and Assignment of Any Transferred Contracts; and (IV) Granting Related Relief* (the "Motion").[2]

## QUALIFICATIONS

4. I am a Director in the Dallas, Texas office of Houlihan, financial advisor and investment banker to the Debtors pursuant to the Court's *Order (I) Authorizing the Retention and Employment of Houlihan Lokey Capital Inc. as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Nunc Pro Tunc to June 8, 2017, (II) Waiving Time-Keeping Requirements, and (III) Granting Related Relief* [ECF No. 335] (the "Houlihan Retention Order").

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

5.     Houlihan is an internationally recognized investment banking and financial advisory firm with 24 offices worldwide and over 1,000 professionals. Houlihan's Financial Restructuring Group, which employs approximately 170 professionals worldwide, is one of the leading advisors and investment bankers to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with financially troubled companies both in and outside of bankruptcy. Houlihan has been, and continues to be, involved in some of the largest restructuring cases in the United States, including representing debtors in numerous chapter 11 cases in this and other Districts.

6.     Since joining Houlihan in 2004, I have specialized in assisting companies and creditors in distressed mergers and acquisitions, special situations financing, and financial restructuring transactions. My experience includes conducting acquisitions and dispositions of financially troubled assets and raising various forms of capital, both in chapter 11 and in out-of-court situations. Prior to joining Houlihan, I was with FTI Consulting and Arthur Andersen LLP in their respective financial restructuring groups. I hold a B.A. from Vanderbilt University and an MBA from the McCombs School of Business at the University of Texas at Austin.

## RETENTION OF HOULIHAN LOKEY, INC.

7.     On June 5, 2017, the Court entered the *Order (I) Authorizing the Retention and Employment of Blackhill Partners, LLC as Financial Advisor and Investment Banker for the Debtors and Debtors in Possession Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Nunc Pro Tunc to the Petition Date Through May 18, 2017, (II) Waiving Certain Time-Keeping Requirements, and (III) Granting Related Relief* [ECF No. 273] (the "Blackhill Retention Order"). The Blackhill Retention Order approved the retention of Blackhill Partners, LLC as financial advisor and investment banker for the Debtors solely for the period from the Petition Date through and including May 18, 2017.

3

8. Thereafter, on June 8, 2017, the Debtors selected Houlihan as their financial advisor and investment banker. Houlihan filed a retention application on June 20, 2017 [ECF No. 292]. The Court entered the Houlihan Retention Order on July 18, 2017. Also on July 18, 2017, the Court entered an *Order Authorizing the Retention and Employment of Clarksons Platou (Offshore) Limited as Broker for Debtor Montco Offshore, Inc., Nunc Pro Tunc to May 26, 2017* [ECF No. 336], pursuant to which Clarksons Platou (Offshore) Limited ("Clarksons") was retained to market and sell the MOI Vessels to potential international buyers.

## PREVIOUS MARKETING EFFORTS

9. It is my understanding that, prior to the Petition Date, Blackhill, in partnership with Clarksons, conducted a process (the "Prepetition Sale Process") to market the Purchased Assets for sale to well over 100 likely prospective strategic and financial purchasers. It is my further understanding that, in connection with the described process, Blackhill populated a digital data room for any prospective purchaser that had executed a non-disclosure agreement (an "NDA") with the Debtors.

10. Blackhill continued to market the Purchased Assets after the Petition Date, and, following entry of the Houlihan Retention Order, Houlihan continued the efforts commenced by Blackhill. To that end, Houlihan proceeded, in coordination with Clarksons, to identify a broad array of strategic and financial potential purchases that were expected to have the interest and ability to consummate an acquisition on terms acceptable to the Debtor. Houlihan compiled relevant information regarding the Debtor and maintained the digital data room (the "Data Room"), designed to be shared with potential purchasers upon the signing of an NDA.

11. Between June 2017 and August 2017, Houlihan and the Debtor, together with Clarksons, contacted over 400 potential buyers (including the parties previously contacted by

Blackhill), with the aim of attracting one or more bidders for the Debtor's assets. At the same time, the Debtor engaged in extensive, arms'-length negotiations with SLH regarding the terms and conditions for the Prior Proposed Transaction. Following this process, and after consulting with its advisors, the Debtor determined that the Prior Proposed Transaction with SLH was the best offer available for the Debtor's assets at that time. Accordingly, the Debtor and its advisors negotiated the terms under which SLH would be a "stalking horse bidder" for a second, Court-supervised sale process (the "<u>Postpetition Sale Process</u>"). In connection with the Postpetition Sale Process, the Debtor sought approval of bidding procedures (the "<u>Prior Bidding Procedures</u>"). In accordance with these procedures, eighteen (18) bidders executed NDAs and were granted access to the Data Room.

12. The pre- and postpetition sale efforts were intentionally broad in order to cover comprehensively the pool of prospective purchasers. Collectively, Blackhill, Clarksons, and Houlihan contacted 414 potential purchasers in over 50 countries regarding the sale of the Purchased Assets. Of those 414 potential purchasers, eighteen (18) chose to execute an NDA with the Debtors and were provided access to the Data Room. Of those eighteen (18) parties that executed an NDA, eleven (11) indicated interest in the Purchased Assets or a portion thereof. Based upon my experience and involvement in the Debtor's efforts to consummate a sale of its assets, it is my view that both the Prepetition Sale Process and the Postpetition Sale Process were comprehensive and afforded all likely interested parties the opportunity to conduct due diligence and formulate proposals.

13. Despite the Debtor's and its advisors' extensive marketing efforts, however, at the conclusion of the Postpetition Sale Process, the Debtor received no competing bids. As such, the Debtor declared SLH the winning bidder and proceeded to consummate the Prior Proposed

Transaction. At the same time, in an effort to achieve a consensual restructuring, the Debtor, along with Houlihan, engaged in discussions with the Committee and its advisors around the terms of the Plan. Despite these efforts, and for reasons set forth in the Motion, the Debtor has determined that pursing confirmation of the Plan is no longer feasible and, as such, is unable to consummate the Prior Proposed Transaction.

## THE DEBTOR'S FINANCIAL POSITION AND THE RENEWED PROCESS

14. MOI does not have the liquidity to support a protracted chapter 11 process given its diminishing access to liquidity. The Debtor's cash position will only continue to decline as this case continues. Currently, the Debtor has approximately $4 million available under the DIP facility and expects to draw down on the full amount to meet its administrative needs in the coming weeks. Even with the additional funds, based on current financial projections, MOI has sufficient liquidity to operate only through the end of January 2018. What is more, expected cash receipts over the next two months are concentrated among a few customers, which may cause collection delays, further deteriorating the Debtor's cash runway.

15. It is against this backdrop that, following the November 8 Ruling, the Debtor determined it is unable to bear the litigation risk associated with pursuing the Plan and Disclosure Statement negotiated with SLH and the Committee. As such, the Prior Proposed Transaction is no longer a viable option. Accordingly, the Debtor concluded that a third marketing and competitive bidding and auction process is MOI's best chance of maximizing value for its estate and avoiding a fire-sale liquidation of its assets.

16. To implement its third marketing process, the Debtor seeks approval of the Motion and the bidding procedures set forth therein. Under the Bidding Procedures, Houlihan, together with Clarksons, will seek to have new or existing bidders submit offers for the Debtor's

assets and, to the extent appropriate, consider the bids in combination, all in an effort to obtain maximum value for the Debtor's assets. I have already reviewed all expressions of potential interest in the Purchased Assets received to date and have been a part of, and will continue to be a part of, ongoing discussions with potential purchasers.

## THE STALKING HORSE AGREEMENT

17. As part of the Debtor's third marketing process, the Stalking Horse has agreed to purchase the Purchased Assets in exchange for the Credit Bid Amount. I submit that the Proposed Transaction with the Stalking Horse constitutes the best offer currently available for the Purchased Assets. Moreover, it is my opinion that subjecting the Proposed Transaction to the competitive bidding and auction process established by the Bidding Procedures is the Debtor's best available option to maximize value for its estate.

## THE BIDDING PROCEDURES

18. The Bidding Procedures are substantially similar to those approved by this Court, with modifications made in an effort to encourage bidding. I believe the proposed Bidding Procedures seek to preserve maximum flexibility and generate the greatest level of interest in the Purchased Assets. Thus, the proposed procedures will encourage a bidding environment for the sale of the Purchased Assets that is as competitive as possible.

19. Importantly, the Bidding Procedures are designed to establish a competitive bidding process subject to the time limitations driven by the Debtor's lack of liquidity. The reality is that the Debtor cannot afford an extended sale process or an extended stay in chapter 11. Even if the Debtor had proposed a longer sale process, however, given the extensive marketing of the Purchased Assets to date, it is my view that any such extended process would be a waste of estate resources. First, the Debtor and/or its advisors has already contacted the

7

universe of potential purchasers twice over the last several months regarding the Purchased Assets (the second time as part of a Court-supervised process).  Second, I anticipate that any entity interested in the Purchased Assets has already executed a confidentiality agreement and/or is familiar with the data room and its contents.  There is little, if any, new information in the data room to consider, and any "ramp-up time" will likely be minimal.  Thus, in my opinion, the accelerated timeframe is warranted given the length and breadth of the marketing efforts undertaken by Houlihan (and Blackhill) of the Purchased Assets.

20. Further, I believe that the Bidding Protections are fair, reasonable, will not chill bidding, and will enable the Debtor to maximize value.  The Bidding Protections contain substantially the same terms as those approved by this Court in connection with the Postpetition Sale Process.  It is my understanding that the Stalking Horse is simply seeking confirmation that substantially the same terms will apply in connection with the Proposed Transaction.  The Bidding Protections were a material inducement for the Stalking Horse to agree to serve as a "stalking horse" and proceed with the Proposed Transaction.

21. In conclusion, I believe that approval of the Bidding Procedures, including the Bidding Protections, will enable MOI to obtain the best possible recovery for its creditors under the current circumstances.

Dated: November 24, 2017        By:     /s/ Michael Boone
       Dallas, Texas                    Michael Boone
                                        *Director, Houlihan Lokey, Inc.*