IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | * | |
| | * | CASE NO. 17-31646 |
| **MONTCO OFFSHORE, INC.,** *et al.*, | * | |
| | * | Chapter 11 |
| DEBTORS. | * | |
| | * | (Jointly Administered) |
| | * | |

**ALLIANCE ENERGY SERVICES, LLC'S AND ALLIANCE OFFSHORE, LLC'S
OBJECTION TO DEBTORS' EMERGENCY MOTION TO APPROVE
BIDDING PROCEDURES AND SALE AND EMERGENCY MOTION
TO APPOINT CHAPTER 11 TRUSTEE OR CONVERT TO CHAPTER 7**
[Related to Doc. 637]

Alliance Energy Services, LLC and Alliance Offshore, LLC (collectively, "Alliance") respectfully object to the *Motion For Sale of Purchased Assets; Emergency Motion of Debtor Montco Offshore, Inc. for an Order (I) Approving (A) Bidding Procedures Governing Submission and Consideration of Competing Transactions, (B) Bid Protections, (C) Form and Manner of Notice of Sale Transactions and Sale Hearing, and (D) Assumption and Assignment Procedures for Any Transferred Contracts; (II) (A) Scheduling and Authorizing Debtor to Conduct an Auction Pursuant to the Bidding Procedures, and (B) Authorizing Debtor to Enter into the Purchase Agreement to Implement the Bidding Protections; (III) Authorizing (A) the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (B) the Assumption and Assignment of Any Transferred Contracts; and (IV) Granting Related Relief Free and Clear of Liens as Described in Section 363(f)* ("Sales Motion") filed by Montco Offshore, Inc.("MOI") and Montco Oilfield Contractors, LLC ("MOC") (collectively "Debtors") as follows:

1

*Emergency Hearing Should Not Be Granted*

1.      Yet again, the Debtors have filed an emergency motion seeking transformative relief on short notice.  The Debtors filed the Sales Motion on November 24, 2017, the Friday of the Thanksgiving weekend.  The Sales Motion advised that a December 4, 2017 hearing date was requested.  However, as of this date, no order or notice has been issued that this Court granted the request for an expedited hearing.   To the extent that the Motion is set on December 4, 2017, Alliance objects to the emergency setting of the motion, particularly in light of the circumstances of this case as explained below.

*Debtors' Misrepresentations to the Court*

2.      In the Sales Motion, the Debtors advised the Court that they no longer intend to pursue confirmation of their Plan and instead intend to sell their assets in less than two weeks to Falcon Global USA LLC (the entity that was to own the Debtors' vessels under the Plan) for the amount of the secured debt (Falcon Global USA LLC intends to credit bid the secured lender's debt).  In justifying their decision to engage in the conduct described in the Sales Motion, the Debtors allege "….that following the Court's decision on estimating the maritime liens, MOI continued discussions with key constituencies, including certain holders of the Asserted Maritime Lien Claims…regarding MOI's options for a path forward." **This statement is false.**  The Debtors did not have *any communications* with any of the four holders of the Asserted Maritime Lien Claims who were parties to the Motion to Estimate regarding its Plan (and whose claims constitute the majority of the maritime lien claims), and upon information and belief, did not communicate with the other holders of significant maritime lien claims regarding its Plan.  UCC Counsel has confirmed that he has not had any discussions with the Debtors regarding the Plan since the Court's ruling on the estimation motion.

3.      The Debtors misrepresentations to the Court are also contained in the pleadings it has filed over the last three weeks:

> In Debtors' Emergency Motion for Entry of an Order Continuing the Confirmation Hearing filed on November 9, 2017 [Dk 585], the Debtors stated that they required additional time to confer with key constituencies to seek consensual changes to the Plan.
>
> On November 13, 2017, the Debtors filed a motion to extend the exclusive period through December 13, 2017 explaining:
>
>> In connection with the Plan process and leading up to confirmation, the Debtors are continuing to engage with additional key stakeholders to address outstanding issues and seek to reach a consensual resolution on a path forward. The Debtors need all of their and their professionals' resources focused on reaching such a resolution. As such, the Debtors seek the relief requested herein to ensure that no competing plan is filed at this critical juncture, which would only distract the Debtors and divert resources away from confirmation-related matters. Reviewing and potentially objecting to a competing plan while negotiating issues related to confirmation of the Debtors' Plan is not in any stakeholder's interests, and would only be detrimental to the outcome of these cases. [Dk. 605, p. 7]
>
> The Debtors requested that the Court extend exclusivity "to ensure that no estate resources need to be shifted toward the review of (and potential objections to) a competing plan while the Debtors continue discussions with key constituencies about confirmation of the Debtors' as-filed Plan." [Dk. 605, p. 5]
>
> On November 15, 2017, the Debtors filed a second motion to extend the confirmation hearing again representing to the Court that they needed the time "to reach a consensual resolution to the currently contested issues related to the Plan." [Dk. 615, p. 6]

Again, the Debtors have not communicated with the maritime lien claimants or the UCC. The Debtors claims that they were working on the Plan (and had to conserve resources so that they could only work on the Plan) were plainly false.

4.      On November 29, 2017, Alliance issued discovery to the Debtors concerning the Sales Motion, including this interrogatory:

> With respect to the statement in the Sales Motion "….that following the Court's decision on estimating the maritime liens, MOI continued discussions with key

> constituencies, including certain holders of the Asserted Maritime Lien Claims…regarding MOI's options for a path forward", please identify (i) each "key constituent" with who you had such discussions and the date, time, and substance of any such discussions, and (ii) each "holder of the Asserted Maritime Lien Claims" with who you had such discussions and the date, time, and substance of any such discussions.

The return date on the discovery was the earlier of 72 hours prior to the hearing on the Sales Motion (if the hearing on the Sales Motion is conducted on December 4, 2017 then the deadline to respond is December 1, 2017) or 10 days from issuance. The emails between counsel for Alliance and the Debtors on this issue and the ongoing refusal of the Debtors to produce documents from Mr. Orgeron and Mr. Boudreaux in response to Alliance's prior discovery requests are attached hereto as Exhibit A. Alliance requests that this Court require that the Debtors provide a full account of their representations to this Court and the creditors in this case.

5.  Why was the Debtor working on the Sales Motion when it told the Court it was working on the Plan? Why would the Debtors make these false representations? Why would the Debtors not have attempted to rectify the issues in its Plan and instead filed the Sales Motion? Alliance can only assume, that like their other actions in this case, the Debtors focus is protecting Mr. Orgeron.

6.  What benefits will Mr. Orgeron receive from the transaction proposed in the Sales Motion? The Sales Motion includes only the crafted statement that "[u]nlike the Prior Proposed Transaction, under the Proposed Transaction, existing equity will not receive any percentage of the interest in the buyer." Sales Motion, p. 15. In an attempt to ascertain the motivation behind the Debtors' actions, Alliance included the following two interrogatories in its discovery requests:

> 1.  Please state whether Mr. Lee Orgeron owns or will own any interest of any kind in Falcon. If so, please fully describe the nature of any such interest.
>
> 2.  Please state whether Mr. Lee Orgeron, Mr. Derek Boudreaux, or any person related to Mr. Orgeron and/or Mr. Boudreaux is or will be employed by Falcon

4

and/or have any business relationship of any kind with Falcon. If so, please identify the individual(s) and fully describe the terms of such employment and/or the business relationship.

The Debtors and Mr. Orgeron should be made to honestly answer these questions before the Court. Mr. Orgeron and those who may be assisting him with any such endeavor should be admonished that should he surface later with an undisclosed interest or relationship of any kind that he will be subject to charges of bankruptcy fraud and other claims. Even if disclosed, Mr. Orgeron cannot receive a "gift" from Seacor or Falcon. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 981, 197 L. Ed. 2d 398 (2017). This consideration must be preserved for the benefit of the estate and not Mr. Orgeron personally.

7. Alliance's discovery requests further sought the production of documents concerning the Sales Motion and the Plan to further determine the true nature of the transaction.[1] As reflected by the emails attached as Exhibit A, the Debtors have not agreed to produce these documents prior to the December 4, 2017 hearing on the Sales Motion.

*The Debtors Have Destroyed Any Prospect For A Valid Marketing Process*

8. In justifying its two week sales process proposed in the Sales Motion, the Debtors seek to convince the Court that they have previously sought to market the Debtors' vessels through the

---

[1] Alliance's discovery requests sought the following:
1. All documents and correspondence by or between Debtors, SEACOR, Falcon, the Bank Group, and/or Houlihan regarding the Plan or the Disclosure Statement.
2. All documents and correspondence by or between Debtors, SEACOR, Falcon, the Bank Group, and/or Houlihan regarding the Sales Motion or the proposed sale to Falcon identified in the Sales Motion.
3. All documents and correspondence by or between Debtors, SEACOR, Falcon, the Bank Group, and/or Houlihan regarding any Alternative Transaction.
4. All documents and correspondence by or between Debtors and any creditor or vendor since October 1, 2017 regarding the Debtors' proposal to pay any such creditor or vendor all part of its prepetition claim as a critical vendor.
5. All documents and correspondence by or between Debtors and the Committee regarding the Plan, the Disclosure Statement, the Sales Motion, and/or the proposed sale to Falcon identified in the Sales Motion.
6. All documents and correspondence by or between Debtors and any Maritime Lien Claimant regarding the Plan, the Disclosure Statement, the Sales Motion, and/or the proposed sale to Falcon identified in the Sales Motion.
7. All documents reflecting or relating to the termination of the JV Agreement (as defined in the Plan) as alleged in the Sales Motion.

"stalking horse auction." Alliance and others strenuously objected to the Debtors' stalking horse motion and Alliance incorporates its objection herein. [Dk. 322] This Court will recall that in the Debtors' motion to approve the stalking horse bidding procedures, the Debtors required that a party who wanted to bid to be the "plan sponsor" had to submit an offer of (1) the total consideration to the Debtor set forth in the Term Sheet, plus (2) the Break-Up Fee, and (3) the Expense Reimbursement, plus (4) $500,000. Of course no bidder could possibly submit a bid because the Seacor term sheet was so convoluted, did not include a value of the transaction to the Debtor, and included numerous provisions to benefit Mr. Orgeron personally that no other bidder could replicate. Moreover, why would any bidder participate in a "stalking horse auction" where it had no assurance of how or when it would be able to close (and be subject to a higher bid or debtor withdrawal later)? Alliance found no case where a Court had approved such a process and the Debtors financial advisor was unable to identify a case approving of such a process.

9.      In response to the objections filed by Alliance and others, this Court forced the reluctant Debtors to make *some* changes to allow cash bids. However, the Debtors refused to change the provision in the bidding procedures that required that bidders close by October 30, 2017, even though Seacor, who had been in discussions with the Debtors since February of 2017, had until December 31, 2017 to close. The Debtors offered no explanation as to why bidders would have two fewer months to close than Seacor. The Debtors were still merely auctioning the "plan sponsor" position and probably could not have confirmed a plan by October 30, 2017 even if a party had been interested in such a position (with no stalking horse protections). Further, the revised stalking horse bidding procedures that were approved by the Court required that qualified bids be posted by August 24, 2017. The Order approving the procedures was entered on August 10, 2017. So bidders had only *two weeks* to submit a bid. The Debtors clearly did not want to

receive bids for their assets because it would mean that Mr. Orgeron would have to give up his equity and the numerous perks of the Seacor bid. Indeed, the Debtors' financial advisor admitted at the estimation hearing that the joint venture proposal "cleared the decks" of other potential bidders. Interested parties were not going to spend the time and money involved in assessing an acquisition of this size under these circumstances.

10. Nonetheless, despite that the Debtors' engineered a process that was designed to fail, the Debtors then used that process to "poor mouth" the value of their own vessels. In attempting to establish that the maritime lien claimants were not secured, the Debtors stated in writing in pleadings filed in this Court that its own vessels were worth less than $116 million. Debtors' financial advisor testified to the alleged lack of interest of potential buyers in the stalking horse auction process. The Debtors used their own deeply flawed "stalking horse" auction to establish that Seacor was paying too much. Sadly, the Debtors "evidence" was barely relevant to the value issue under section 506(a) which was the value of the vessels in the hands of the joint venture. Given that Seacor owns all of the other large lift boats but one operating in the Gulf of Mexico, the section 506(a) value was much higher than even then $246,310,000 value contained in the Debtors' January 2017 appraisals for the vessels. This explains why the Debtors refused to include projections in its Disclosure Statement and Plan. While the Sales Motion does not disclose whether the Debtors or Seacor abandoned the Joint Venture Agreement, Seacor presumably saw an opportunity to obtain the assets for less than the $163,359,700 value provided for the vessels in the Joint Venture Agreement. For some reason, the Debtors did not resist the Seacor exit from the Joint Venture Agreement.

11. In the Sales Motion and under the alleged emergency that it created, the Debtors now propose a last minute auction with bids of a minimum of $136,132,264.94 due on December 14,

2017, 10 days from the December 4, 2017 hearing. Like its prior marketing efforts, the Debtors have assured that no one will participate. However, even with more time, it is unlikely that any party would spend the resources to investigate the assets so as to compete with the Falcon bid which is clearly tied to Mr. Orgeron and the secured lender.

*Collusion With The Lender*

12. This Court will recall the concerns raised by the objectors to the stalking horse auction process that the proposed procedures did not provide a mechanism for a potential bidder to engage with the secured lender. Since under the Falcon-Debtor joint venture arrangement the secured lender's debt was going to be assumed by Falcon, any party wishing to propose a similar joint venture would have been required to discuss terms with the lender. The Court required that the Debtors insert a provision in the procedures that the Debtors would attempt to coordinate such contact if requested to do so.

13. The Sales Motion now provides that "it is contemplated that the First Lien Agent and Lenders will support the Stalking Horse on terms and conditions that will be set forth in a claims assignment agreement." Sales Motion, p. 14. The Sales Motion provides that Falcon will credit bid the secured lender's claim. This Court should reject this proposed collusion between two potential bidders. As evidenced by the terms of the Sales Motion and the Joint Venture Agreement, this collusion has already damaged the value of the Debtors' assets by setting the price Falcon proposes to pay.

14. The secured lender is clearly a potential bidder for the Debtors' assets. The Debtors have already identified Seacor as the strategic bidder for its assets. By colluding, Seacor-Falcon's price became the secured lender's credit bid amount. 11 U.S.C. §363(n) provides as follows:

> [t]he trustee may avoid a [§ 363 sale] if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to

such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

Section 363(n) requires that: (1) there must be an agreement; (2) between potential bidders; (3) that controlled the price at bidding." *In re Sanner*, 218 B.R. 941, 944 (Bankr. D. Ariz. 1998). "An agreement proscribed by section 363(n) need not be an explicit written agreement, but may be an oral agreement to collude or an agreement inferred from the behavior of the parties or the circumstances." *In re Sunnyside Timber, LLC*, 413 B.R. 352, 363 (W.D. La. 2009) (citing *Loan Star Indus., Inc. v. Compania Naviera Perez Companc, Sudacia (In re N.Y. Trap Rock Corp.)*, 42 F.3d 747, 753 (2d Cir. 1994)). Not only has the collusion set the lender's debt as the Falcon price, the collusion blocks any potential bidder from working with the lender on an alternative bid. At least under the stalking horse procedures a potential bidder had the chance to discuss an alternative bid with the lender. Now that chance will be gone because Falcon will own the lender's claim.

15. By requesting that this Court approve bidding procedures that include Falcon's assigned credit bid rights, the Debtors seek Court countenance of this collusion. This Court should reject the Sales Motion on this basis alone.

16. Further, the lender has not filed the necessary Rule 3001(e) form indicating that its claim has been transferred to Falcon. Page 14 of the Sales Motion provides that the "Claims Assignment Agreement" will be filed prior to the hearing on the Motion. Such a filing (which has not yet occurred) would not satisfy the requisites of Bankruptcy Rule 3001(e). Yet again, the Debtors have filed a motion based on an important document that is not to be filed until just before the hearing.

*The Debtors Attempt to Effectively Obtain Releases Through the Sales Motion*

17.     The Sales Agreement provides that all claims and causes of action of the estate are to be transferred to Falcon.  This provision surely benefits Mr. Orgeron and his family members who worked for the Debtors.  In 2013, Mr. Orgeron took $20,000,000 from MOI and signed a note in its favor.  Despite its dire financial condition, MOI never called the note in default and never sought to collect the note.  The note clearly left MOI without adequate capital.  Before piercing the veil, alter ego claims and breach of fiduciary duty claims surrounding these facts are sold with no value being ascribed thereto, the creditors have the right to know the full facts relating to potential claims and the amounts involved. These assets have never been marketed and are not being marketed.  Further, the officers of MOC and MOI which approved the Black Elk contract and the administration of the contract appear to have been, at best, grossly negligent. What potential claims does the Debtor have against its officers and directors and other parties as a result of the Black Elk contract disaster which caused its bankruptcy?  Also, based on financial documents recently produced by the Debtors, prior to the bankruptcy Mr. Orgeron had a salary in excess of $900,000 annually, a Colorado home on the books of the Debtor, excessive rent paid to a family trust that owned the Debtors' office in Louisiana, among other items.  These avoidance actions will be lost if the Sales Motion is approved.  By converting the Plan (where releases of such claims were impermissible) into the Sale Motion (where such claims are being sold along with the vessels for a price less than that ascribed to the vessels alone in the Joint Venture Agreement), Mr. Orgeron is seeking an effective release of these claims.  At a minimum, these claims should not be sold.

*Sub Rose Plan*

18.     *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) the Fifth Circuit reversed a sale order under section 363(b) because the transaction established a *sub rosa* plan.  Here, the Debtors have converted their Plan into a section 363 motion.  *In re Braniff Airways, Inc.* clearly requires denial of the Sales Motion in this case.

*Jurisdiction to Discharge Maritime Liens*

19.     The issue of bankruptcy court jurisdiction to discharge maritime liens is not settled and remains an open question.  *See In re Millennium Seacarriers, Inc.*, 419 F.3d 83, 94 (2d Cir. 2005). Alliance maintains its position that this Court does not have jurisdiction to discharge and release maritime liens in a section 363 sale.

20.     Alliance is aware of this Court's position on its jurisdiction to discharge maritime liens. Nonetheless, Alliance respectfully submits that even if this Court is correct as to its jurisdiction, a section 363 sale that discharges maritime liens should clearly provide the same sort of notice and protections afforded the parties in maritime sales under 46 USC §31326.  Clearly in this case this proposed sales process does not comport with due process.

*Options from Here*

21.     Since the Debtors' recent appraisals show that its vessels are worth $246,310,000 and the secured debt is approximately $132,000,000 (and the lender has already stipulated that it is oversecured), Chapter 11 options remain.  Alliance represents to the Court that it has been requested by certain constituents in this case to make a DIP loan (to replace the existing DIP loan) and to consider sponsoring a plan.  Alliance is seriously considering this option and requests that it be provided an opportunity to propose terms to the creditors in this case.

22.     Based on what has occurred in this case, Alliance also submits that a Chapter 11 Trustee would be helpful to ensuring that the Debtors maximize the estate.  A Chapter 11 Trustee could

properly engage in a marketing process or consider a creditor reorganization. A Chapter 7 liquidation would be preferable to the existing Sales Motion which ensures that the trade creditors of MOI receive nothing.

23. Finally, Alliance requests that this Court review the objections filed to the Debtors' Plan by Alliance and others. Most of the objections centered on 1) a lack of information, including a lack of projected recoveries to creditors, projections of revenue for Falcon, and the secured lender's ability to sweep available cash; 2) Mr. Orgeron's or MOI's ability to dilute or re-direct funds that would otherwise be available to creditors; 3) Mr. Orgeron's insistence that MOI's obligations to make distributions to creditors lapse after certain time periods and that his equity share in the distributions prior to creditors being paid; and 4) Mr. Orgeron's insistence that he be released. These issues did not directly impact the lender or Seacor—these issues could have been addressed by Mr. Orgeron if he had chosen to do so. Clearly Mr. Orgeron had no interest in negotiating such terms with the creditors—he refused to make any attempt to address the objections and instead authorized the Debtor to file the Sales Motion. Mr. Orgeron could not possibly have been acting in the best interests of the estate. While the Plan did have other structural issues, the most important issues were lack of disclosure and Mr. Orgeron's failure to recognize that equity falls below creditors in the priority scheme of the Bankruptcy Code.

24. Mr. Orgeron should be compelled to work for the best interests of the estate and sacrifice his personal benefits for the creditors.

**WHEREFORE,** Alliance Energy Services, LLC and Alliance Offshore, LLC pray that this Court deny the Sales Motion, appoint a Chapter 11 Trustee, and/or take such other action as this Court deems appropriate under the circumstances and section 105 of the Bankruptcy Code.

Dated: December 1, 2017.

        Respectfully submitted,

        **CARVER, DARDEN, KORETZKY, TESSIER FINN, BLOSSMAN & AREAUX, L.L.C.**

        /s/ *David F. Waguespack*
        DAVID F. WAGUESPACK
        La. Bar Roll No. 21121
        *Appearing Pro Hac Vice* [Doc. 85]
        waguespack@carverdarden.com
        BRANDON T. DARDEN
        State Bar No. 24075614
        Fed. ID No. 1339565
        bdarden@carverdarden.com
        1100 Poydras Street, Suite 3100
        New Orleans, Louisiana 70163
        Telephone: (504) 585-3814
        Fax: (504) 585-3801

        *Attorneys for Alliance Energy Services, LLC and Alliance Offshore, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 1, 2017, a true and correct copy of this document was filed with the Court using the CM/ECF System, which provided electronic notice to all parties in the bankruptcy case requesting such notice.

        /s/ *Brandon T. Darden*
        BRANDON T. DARDEN

4820-0866-6455, v. 1