**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 17-31646** |
| **MONTCO OFFSHORE, INC.,** *et al.*,[1] | § | |
| | § | **Chapter 11** |
| **Debtors.** | § | |
| | § | **(Jointly Administered)** |
| | § | |

**DEBTOR'S REPLY BRIEF IN SUPPORT OF MOTION TO APPROVE
BIDDING PROCEDURES AND IN RESPONSE TO OBJECTIONS THERETO**
(Related Docket Nos. 637, 659, 661, 662, 663, 669, 671 and 677)

**TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:**

Debtor Montco Offshore, Inc. ("MOI" or the "Debtor"), a debtor and debtor-in-possession in the above-captioned chapter 11 cases of MOI and its wholly owned subsidiary, Montco Oilfield Contractors, LLC ("MOC" and, together with MOI, the "Debtors"), by and through its co-counsel, Drinker Biddle & Reath LLP and DLA Piper LLP (US), hereby files this reply brief (this "Reply") in support of its motion [Docket No. 637] (the "Motion") to approve certain Bidding Procedures[2] and related relief as further described in the Motion, and in response to certain objections thereto, and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The relief requested in the Motion is "Plan B."  The Debtor has not shied away from that fact.  Indeed, the Motion describes how the Debtor would have preferred to, but could not, confirm its Plan, given the uncertainty surrounding the purported maritime lien claims following this Court's ruling at the estimation hearing.

---

[1]    The Debtors in these chapter 11 cases, together with the last four (4) digits of each Debtor's federal tax identification number, are Montco Offshore, Inc. (1448) and Montco Oilfield Contractors, LLC (9886).  The mailing address for the Debtors, solely for the purposes of notices and communications, is 17751 Hwy 3235, Galliano, Louisiana 70354.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2.      To be sure, the Debtor's Plan provided a tremendous amount of value to unsecured creditors, while also satisfying in full the Debtor's first-lien debt obligations.  But the simple fact is that the purported maritime lienholder class, sandwiched between those two constituencies, voted against the Plan, and the Debtor, in consultation with its Plan sponsor and lenders, did not believe it could successfully "cram down" the Plan on that class.

3.      The 363 sales process, then, is the next best option to the Plan.  A sales process with a stalking horse willing to fully satisfy the Debtor's first-lien debt obligations – and one that does not seek to purchase any of MOC's assets – is a far better result for creditors of each of the Debtor's estates than the available alternatives.  It is certainly not as valuable to creditors as the Plan would have been.  And it completely wipes out equity, which the Plan did not.  But, under the circumstances, the sales process, in the Debtor's business judgment, represents the best way to maximize value for the estate and its creditors.  The Motion should be granted, and the Debtor should be permitted to proceed on a path that, as a baseline, enables it to satisfy over $130 million in secured obligations, and paves the way toward a potential (and potentially significant) recovery to its other creditors.

## REPLY[3]

**A.    The Debtor Carefully Considered Alternatives to the Motion, Including the Committee's "Suggested Alternative," and Determined In Its Business Judgment that the 363 Sales Process Will Maximize Value to the Estate.**

4.      In its objection, the Committee argues that it "suggested alternative structures for an amended plan" which "the Debtors have ignored."  *See* Official Committee of Unsecured Creditors' Objection to the Motion [Docket No. 669] (the "Committee Objection") at ¶ 28. Other allegations raised by the Committee include the Debtor's purported "woefully inadequate

---

[3]    This Reply does not attempt to respond to each and every allegation raised in the various objections filed over the last several days, some of which will be addressed at the hearing.

marketing and sale timeline that cannot possibly provide satisfactory exposure for the Purchased Assets" (*id.* at ¶ 17) and "whether the Proposed Transaction has been proposed in good faith," given the alleged "significant releases for Mr. Orgeron and his family members, some or all of whom are also employees of the Debtors" (*id.* at ¶ 27).

5.      Curiously, the Committee provides no details as to what exactly its "suggested alternative" is, while spuriously stating that the Debtor "ignored" it.   Contrary to the Committee's assertion – as well as to Alliance's bald assertion that the Debtor did not speak with the Committee after the estimation ruling (*see* Alliance Energy Services, LLC's and Alliance Offshore, LLC's Objection to the Motion [Docket No. 662] (the "<u>Alliance Objection</u>")) – the Debtor <u>did</u> engage the Committee following the ruling to discuss alternatives to the proposed Plan.  As described in the email communications attached hereto as **Exhibit A**, counsel to the Debtor acknowledged to counsel to the Committee that the latter made a "creative suggestion regarding how to preserve the substance of the deal [under the Plan], while changing the form." *See id*.  Ultimately, for the reasons described in the email exchange and below, the Debtor determined that the Committee's proposal was too risky to bear.

6.      In short, the Committee's suggestion envisioned a 363 sales process under which Mr. Lee Orgeron, CEO of the Debtor, would serve as a minority interest holder in a purchasing entity, with the same equity percentage that the Debtor *would have received* in the joint venture described in the (now withdrawn) Plan.  The upside of "changing the form" of the deal, from the Committee's perspective, would be that the sale of assets, followed by the proposal of a liquidating plan, would eliminate the hurdle of a maritime-lien class of claims, given that the 363 sale would extinguish such claims (to the extent that the value of bids received did not clear the first-lien and DIP debt).  The Committee would support this "insider" sale, according to the

"suggested alternative," and the plan would preserve the previously negotiated deal with unsecured creditors (a class that would slightly increase in size, given that the maritime lienholders would join that creditor pool).   At bottom, the Committee's proposal would effectively preserve the Plan's structure, while overcoming the present hurdle of the rejecting class of maritime lien claims.

7.      Given the Debtor's cash constraints, the Committee's alternative proposal would have necessarily involved an expedited marketing and sales process – a process about which the Committee now complains, despite also supporting such an expedited process during the Plan sponsorship process several months ago.   Unlike the proposed process, the Committee's alternative proposal would expressly involve an insider transaction.   Again, the Committee now complains about the Proposed Transaction as an insider deal (which it is not), even though the Committee itself proposed such a deal to the Debtor just a few weeks ago.

8.      And contrary to the Committee's assertion that the Debtor "ignored" its proposal, the Debtor's counsel's email to the Committee's counsel paints a different picture.   In that email, Mr. Avraham states:

> "We discussed internally, and with SEACOR and the banks.  All agreed that there was too much risk involved in [the Committee's] proposal, and that we did not have the time/cash/patience from our buyer to test out a path that could ultimately fail and lead to a fire-sale liquidation process."

*See* Exhibit A.   Just because the response to the Committee's proposal was "no" does not mean that such proposal was "ignored."  To the contrary – it was vetted by the Debtor and its advisors, the Debtor's lenders, and the former Plan-sponsor-turned-Stalking-Horse, as were other potential alternatives.   Ultimately, though, given the risks involved in the blatantly insider nature of the

transaction, as well as the potential exposure to *sub rosa* allegations[4] by the maritime lienholders (who would undoubtedly view the transaction as a simple run-around the Court's ruling at the estimation hearing), the Debtor determined, in an exercise of its valid business judgment, that the Committee's proposal was not a viable alternative to a straight 363 sale, as presently proposed by the Debtor.

**B.     The Proposed Transaction Is Not an Insider Sale, and Any Benefits to Insiders Will be Market Tested Against Competitive Bids.**

9.      Even if the Proposed Transaction were an "insider transaction" – which it is not – the Bidding Procedures include safeguards to ensure that any "taint" by the insider nature of the transaction be eliminated.  At the previous bidding procedures hearing on August 3, 2017, the Debtor agreed to grant the Committee the independent right to designate a bid as a "Qualified Bid."  Doing so, the Court remarked, "cured" any "taint" over the alleged "inappropriate" nature of an insider benefit.  Hr'g Tr. Aug. 3, 2017 at 87:11-22.  At the time, the Committee raised no additional concerns with this approach.

10.     In fact, at that hearing, the Court remarked: "I'm not understanding why these things [i.e. insider benefits], if they are inappropriate, don't simply make somebody else bid more," concluding that "it's okay, so long as it gets submitted to a competitive bidding process." *Id.* at 87:21-24.  The Court noted that "[t]he bidding process should sort that out where there would be then a competitive bid that would eliminate what I'll call the '[Orgeron] Benefits' and

---

[4]     Here, too, the Committee and certain other objecting parties raise allegations that the proposed 363 sales process is a "thinly veiled *sub rosa* plan." *See*  Committee Objection, ¶ 24.  In support, the Committee argues that the Proposed Transaction "substantially fixes creditor recoveries[.]" *Id.*  Oddly, having supported the prior marketing process, the Committee suddenly casts unfounded doubts over the Debtor's marketing efforts, dubbing the proposed process a "sham sale and marketing process." *Id.*, ¶ 17.  The Committee cannot have it both ways: it cannot support the Debtor's prior (and similarly expedited) marketing efforts when suitable, but now argue that those efforts are a "sham."   The reality is that the only thing "fixed" by the Proposed Transaction is the floor for a winning bid.  No "creditor recoveries" are fixed, and the entire purpose of the marketing and sales process is to increase value, to the extent possible, for the benefit of creditors of the estate. There is no *sub rosa* plan.

result in a higher price." *Id.* at 86:19-22; *see also id.* at 30:16-23 ("… the process gets a little bit tainted because people read this stuff and they say … they probably shouldn't bid because an insider has an inside track. **But that gets eliminated if the Committee has the equal opportunity to make somebody a qualified bidder, then the insider doesn't have an inside track, it's fair** and we eliminate, I think, the taint.")

11.     Here, the Debtor's proposed Bidding Procedures substantially mimic the previously Court-approved (and Committee-sanctioned) procedures, including the provisions granting the Committee an independent opportunity to qualify a bidder. As such, any "insider benefit" allegations – benefits which the Court has already determined are not "inherently wrong" (*see id.*, 86:23-24) – can and will be tested against competitive bids and "eliminate the taint" associated with the appearance of an insider having an "inside track."

12.     Similarly, several of the objections raise the unfounded concern that the Debtor seeks to obtain releases through the Motion. For example, both the Committee and Alliance allege, with no support, that the Stalking Horse's proposed purchase of certain assets, including a $20 million note from Mr. Orgeron, effectuates "releases for the Debtors and their insiders." Committee Objection, ¶ 25; *see also* Alliance Objection, ¶ 17.[5]

13.     First, the Stalking Horse is purchasing substantially all assets of the Debtor, excluding chapter 5 causes of action and assets of Montco Oilfield Contractors, LLC. Each acquired asset provides value to the Stalking Horse. Unless a competing bidder offers to purchase such assets with a higher and better offer, the Debtor appropriately seeks to sell substantially all of its assets in consideration for satisfying over $130 million in secured debt. Second, none of the objections has even alleged that the Stalking Horse would *not* seek to

---

[5]     Notably, Oceaneering did <u>not</u> join in this portion of the Alliance Objection.

capitalize on each of the Purchased Assets, including enforcing receivables and pursuing causes of action.

14.     The objecting parties are incorrect that impermissible releases are sought through the sale process; but Alliance has taken this allegation one step further, absurdly alleging that the entire focus of the Debtor "is protecting Mr. Orgeron."  Alliance Objection, ¶ 5.  To be sure, as is often the case in the a 363 sales process, the Stalking Horse proposes to hire certain of the Debtor's employees, including Mr. Orgeron, to assist in running the business that the Stalking Horse seeks to purchase.  This is not remotely out of the ordinary.  However, unlike the previously proposed Plan, in which the Debtor was to reorganize and obtain an approximately 27% equity interest in a joint venture with existing equity remaining in place, **here, equity receives nothing**.  The Debtor's equityholders are selling a 70-year-old family owned business, not to "protect" themselves, but rather, as estate fiduciaries, to maximize the value of their company's assets.  This is clearly not their preferred route.  As stated above, it is "Plan B."  But it is the <u>only</u> viable alternative to the previously proposed Plan.

## C.     Contrary to the Committee's Assertion Otherwise, the Proposed Transaction Does Not Leave Unsecured Creditors With No Recovery.

15.     The Committee dramatically overstates the impact of the Proposed Transaction on the unsecured creditors.  Throughout its objection, the Committee argues that the relief requested in the Motion would leave "no value for unsecured creditors."  *See* Committee Objection, ¶ 14. This is false.  The Proposed Transaction expressly leaves behind all chapter 5 causes of action to the Debtor's estate, and also leaves behind <u>all</u> <u>assets</u> of the Debtor's wholly owned subsidiary, MOC.  This is particularly noteworthy, given that the First Lien Lenders have a valid, first-priority lien on all assets of MOC, and could sell (or otherwise themselves credit bid) their secured claim with respect to those assets.  That said, the Debtor has repeatedly acknowledged

that this path is not as lucrative for unsecured creditors as the Plan would have been.  The Plan, however, could not be confirmed.  This path is simply the best alternative under the circumstances, and no creditor to date has presented to the Debtor a viable, more value-maximizing alternative.

16.     The Committee Objection is borne out of a frustration regarding the Plan process – a frustration wholly shared by the Debtor.  But, in light of the Committee's prior support for an expedited sales and marketing process of the Debtor's assets, coupled with the fact that the Committee's "suggested alternative" included several of the same (and some additional) features of a process about which it now complains, the objection rings hollow and, along with the other objections to the Motion, should be overruled.  The Motion, with respect to bidding procedures, should be approved.

**D.     The Alliance Objection is Nothing More Than a Competitor's Renewed Attempt to Harm the Debtor, its Employees and its Estate.**

17.     One constant throughout these cases is the attempt by Alliance, at each turn, to obstruct and frustrate the Debtor's efforts.  No exception here.  Alliance and – in joining Alliance's objection – Oceaneering, assert, with no justification, that a chapter 7 liquidation is preferable to a 363 sales process.  Alliance Objection, ¶ 23.  On its face, this is astonishing: it is difficult to fathom how a straight liquidation of the Debtor's assets under any circumstances would provide sufficient value to the estate to meet its first-lien secured obligations in excess of $130 million, let alone provide any residual value to other estate creditors.

18.     But Alliance's position comes as no surprise to the Debtor.  After all, Alliance has held this position since the first week of these cases.  On March 23, 2017, the Court held a hearing on the Debtor's proposed post-petition financing, during which counsel for Alliance, in his cross-examination of the Debtor's CFO, Mr. Derek Boudreaux, suggested that it would be

"better to park [all the Debtor's assets] … nice liquidation process."  Hr'g Tr. Mar. 23, 2017 at p. 58:5-9.  To that suggestion, the Court responded: "Liquidation makes no sense right now under the Evidentiary Record."  *Id.* at 66:6-7.  In fact, the Court went on to say at that hearing:

> "[I]t's uncontested in the Evidentiary Record that the party leading the charge here [i.e. Alliance] is, in fact, a competitor of the Debtor, and the arguments being made that this Debtor is better off liquidation.  I can't imagine a creditor is better off with an early liquidation."

*Id.* at 68:3-8.  In other words, Alliance has professed from the get-go that the Debtor should liquidate, rather than reorganize (under its prior proposed Plan) or sell its assets in a 363 sale process (under its current Motion).  This is, naturally, the position of a cunning competitor, not a concerned creditor.

19.     And Alliance did not stop there.  At a TRO hearing involving Alliance's arrest of certain derrick barges chartered by the Debtor, the Court raised serious concerns about Alliance, as a competitor of the Debtor, "acting adverse" to unsecured creditors.  Hr'g Tr. May 18, 2017 at p. 16:22.  Given that, at that time, Alliance served on the unsecured creditors' committee, the fact that Alliance sought to harm the Debtor's business – a goal which, in and of itself, may be legitimate competitive conduct – may have been a breach of Alliance's then-fiduciary duties. *See id.* at 17:6-10 ("And I don't understand how stopping the [D]ebtor from getting access to this vessel, even if it's in your client's legal rights, isn't, nevertheless, inconsistent with his fiduciary relationship to the creditors of the estate.  That's my concern.")  **It is no mystery, then, why, <u>fewer than two (2) hours after the conclusion of that hearing</u>, in which Alliance was accused of acting in its own self-interest to the detriment of unsecured creditors, Alliance resigned from the Committee**.  *See* Email from E. Trosclair to J. Wolfshohl dated May 18, 2017, a copy of which is attached hereto as **Exhibit B**.

20.     Again, it is not remarkable that a competitor of the Debtor would relish in the Debtor's demise.  But for a competitor to do so under the guise of seeking to "maximize the [value of the] estate" (*see* Alliance Objection, ¶ 22), while it has a track record of seeking to do nothing but *minimize* such value, is facially disingenuous.

21.     Not only is the general thrust of Alliance's objection insincere; it is also riddled with demonstrably false representations.  Ironically, many of these misrepresentations appear in the section of the objection titled "Debtors' Misrepresentations to the Court."   First, Alliance grossly mischaracterizes – and misquotes – a contention made in the Motion, only to then conclude, underlined and bolded, that the manufactured quote "is false."  *Id.* at ¶ 2.  Adding a word to the sentence at issue, and deleting a few more, Alliance states that the Debtor alleged:

> "….that following the Court's decision on estimating the maritime liens, MOI continued discussions with key constituencies, including certain holders of the Asserted Maritime Lien Claims…regarding MOI's options for a path forward."

*Id.*  The actual contention, however, without the misleading ellipses and addition of the word "that" at the beginning of the sentence, reads as follows:

> "**Leading up to and** following the Court's decision on estimating the maritime liens, MOI continued discussions **with its advisors and** key constituencies, including certain holders of the Asserted Maritime Lien Claims…regarding MOI's options for a path forward."

*See* Motion, ¶ 8.[6]

22.     In other words, the Debtor, before and after the Court's ruling on the estimation motion, spoke with an array of constituents regarding potential next steps.  This included

---

[6]     This is not the only instance of Alliance blatantly misrepresenting the record in this case.  Another example lies in paragraph 10 to the Alliance Objection, in which Alliance, in a convoluted attempt to show that the Debtor's assets are worth more than the Debtor has represented, states: "This explains why the Debtors refused to include projections in its Disclosure Statement and Plan."  Alliance Objection, ¶ 10.  **This is plainly false**.  The Debtor filed projections to the Disclosure Statement over two months ago, on October 2, 2017 at Docket No. 453.

discussions with counsel to several of the maritime lienholders leading up to and at the estimation hearing, as well as counsel to the Committee, who also conveyed that they spoke to the lienholders' counsel following the estimation hearing and described such conversations to the Debtor's counsel.  Alliance also falsely alleges that the Debtors have not had "any discussions" with the Committee's counsel "since the Court's ruling on the estimation motion."  Alliance Objection, ¶ 2.  The email exchanges between the Debtor's counsel and the Committee's counsel attached as Exhibit A plainly undermine that allegation.[7]

23.     In short, the Alliance Objection is filled with flagrant misstatements and misrepresentations, all under the guise of exposing purported misrepresentations by the Debtor.  Alliance's bad faith in these cases is a recurring theme and should not be countenanced.  The Alliance Objection should be overruled.

**E.     The Debtor Has Not Colluded With Its Lenders and the Proposed Bidding Procedures Order Expressly Provides for the Debtor's Facilitating Bidders' Requests to Confer with the First Lien Agent.**

24.     In another questionable portion of its objection – a portion in which Oceaneering did not join – Alliance concocts a conspiracy theory about purported "collusion" efforts between the Debtor, its Stalking Horse, and the First Lien Lenders.  Alliance argues that such collusion has "controlled the price at bidding" and "blocks any potential bidder from working with the lender on an alternative bid."

---

[7]     As to the discovery issues raised by Alliance, the allegations raised are specious.  Alliance served discovery on the Debtor at 7:05pm CT on Wednesday evening, November 29, 2017.  The email exchange attached by Alliance to its objection shows the Debtor's attempt to clarify the timing of the requested documents, and to also narrow the issues most relevant to the bidding procedures hearing, to ensure a timely – albeit incredibly expedited – production turnaround.  What is more, the Debtor formally responded to discovery fewer than 48 hours after it was first served, at 4:56pm CT on Friday afternoon, December 1.  Debtor's counsel also diligently and quickly responded to Alliance's counsel's follow-up question regarding the Debtor's interrogatory responses.  *See* Emails Dated 12/1/2017-12/2/2017 attached hereto as **Exhibit C**.  The Debtor also intends to make a rolling production of documents on an expedited basis, as communicated to Alliance's counsel, despite the outrageously overbroad – and, in some instances, entirely irrelevant – document requests.  *See id.*  In fact, the production began this morning, after only two (2) business days since the Debtor first received the discovery requests.

25. At the outset, the idea that the proposed purchase of a creditor's claim amounts to collusion is facially untenable. That proposition would undermine the entire claims-purchasing process, which is expressly sanctioned by the Bankruptcy Rules. Also, to the extent another party actually does seek to purchase the First Lien Lenders' claims, nothing is stopping that party – nor has anything stopped that party in the nearly 9 months since this case has been on file – from making an offer to the lenders. To date, the Debtor is unaware of any such alternative offer having been made, or even suggested, to the lenders.

26. Similar issues have been raised by certain of the objecting parties with respect to the mechanics of the proposed "credit bid" by the Stalking Horse, in connection with the proposed Claims Assignment Agreement (filed at Docket No. 666) between the First Lien Lenders and the Stalking Horse. *See, e.g.,* Committee Objection, ¶¶ 29-32. While the Debtor believes that the mechanics of the credit bid are appropriate, and that a third-party purchaser is entitled to obtain a secured claim and "credit bid" that claim in the context of a 363 sales process, the Debtor, at the hearing on the Bidding Procedures, will address the 363(k) concerns raised by certain objecting parties and propose a modified purchase mechanism by which the Stalking Horse will directly purchase the Debtor's assets in exchange for cash and for effectuating a release of all claims under the First Lien Facility.[8] The Stalking Horse APA will

---

[8] Specifically, the Stalking Horse APA, as amended, will provide that the consideration for the Purchased Assets consist of (i) an amount in cash paid by the Buyer to the Debtor in an amount equal to $15,000,000, (ii) the release, waiver, deemed satisfaction and deemed payoff of the outstanding obligations and indebtedness of MOI under the First Lien Facility, including the release of all Liens on or against the Purchased Assets arising under the First Lien Facility and (B) the release of all Liens on or against the Purchased Assets arising under the DIP Facility (clauses (A) and (B) collectively, the "Claims Release"), in each case, becoming effective pursuant to consummation of the transactions contemplated by a certain claims release agreement (including the consummation of the transactions contemplated by the Exit Facility) (the "Claims Release Agreement"), and (iii) the assumption by the Buyer of the Assumed Liabilities. The Claims Release Agreement, to be executed concurrently with the Stalking Horse APA, will provide that each of the First Lien Agent, First Lien Lenders, DIP Agent and DIP Lenders will, among other things, substantially simultaneously with (and subject to) the Closing under the Stalking Horse APA, effect the Claims Release in exchange for the Buyer entering into, as borrower, the Exit Facility.

otherwise remain substantially the same as the as-filed version, and the value of the bid – and net effect to the estate – remains unchanged.

27.     It is worth noting that the Debtor's proposed order approving the Bidding Procedures, in maintaining an aspect of the previously approved bidding procedures, provides that the Debtor will use "best efforts to facilitate any potential bidder's request to confer with the First Lien Agent with respect to such party's potential Bid."  *See* Exhibit A to Motion, ¶ 29. Thus, between the amended mechanism for the Stalking Horse's bid, coupled with the Debtor utilizing best efforts to facilitate discussions with potential bidders and the First Lien Agent, the accusation of "collusion" cannot be supported, and the Alliance Objection should be overruled.

## CONCLUSION

28.     The Debtor is running out of time in chapter 11.  Its most recently filed DIP budget (at Docket No. 655) shows severe liquidity constraints, with funds set to run dry as of late January 2018.  The Proposed Transaction, as a baseline to a marketing and sales process culminating in a public auction, represents the best and most viable alternative available to the Debtor, under the circumstances, to maximize the value of its assets for the benefit of all creditors.  The Motion should be granted.

[*Remainder of Page Intentionally Left Blank.*]

Dated: December 4, 2017
Dallas, Texas

**DRINKER BIDDLE & REATH LLP**

By:   */s/ Vincent P. Slusher*
       Vincent P. Slusher (State Bar No. 00785480)
       1717 Main Street, Suite 5400
       Dallas, Texas 75201
       Telephone: (469) 357-2500
       Facsimile: (469) 327-0860
       vince.slusher@drinkerbiddle.com

       -and-

**DLA PIPER LLP (US)**

       Daniel M. Simon (admitted *pro hac vice*)
       David E. Avraham (admitted *pro hac vice*)
       444 W. Lake Street, Suite 900
       Chicago, Illinois 60606-0089
       Telephone: (312) 368-4000
       Facsimile: (312) 236-7516
       daniel.simon@dlapiper.com
       david.avraham@dlapiper.com

       *Attorneys for the Debtors*